PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NIELS C. JENSEN,
            *Plaintiff-Appellant,*

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION,
            *Defendant-Appellee.*

$\left.\right\}$ No. 05-1611

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-04-1316-1)

Argued: May 25, 2006

Decided: July 24, 2006

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge King joined.

---

## COUNSEL

**ARGUED:** Michael Alan Dailey, ANDERSON DAILEY, L.L.P., Atlanta, Georgia, for Appellant. Janine Cone Metcalf, JONES DAY, Atlanta, Georgia, for Appellee. **ON BRIEF:** Mark Ford, ANDERSON DAILEY, L.L.P., Atlanta, Georgia; Tameka M. Collier, TROUTMAN SANDERS, L.L.P., McLean, Virginia, for Appellant. Jordana R. Sternberg, JONES DAY, Atlanta, Georgia; Gregory A. Castanias, JONES DAY, Washington, D.C., for Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

Niels Jensen, a successful software salesman for IBM Corporation, commenced this breach of contract action against IBM for $2.1 million in additional commissions that Jensen claims he earned in 2001 under IBM's Software Sales Incentive Plan. The district court concluded that the plan did not create an enforceable contract obligating IBM to pay the commissions and granted summary judgment to IBM. For the reasons that follow, we affirm.

I

IBM hired Jensen in 2000 as a software sales representative. He was hired as an at-will employee whose employment at IBM could be "ended by the employee or IBM at any time with or without cause." His compensation consisted of base pay plus variable pay, commissions, awards, and other forms of earnings designed to "attract, retain and motivate high-performing employees."

In 2001, IBM announced the 2001 Software Sales Incentive Plan ("the Sales Incentive Plan"), a unified compensation plan for all of its sales employees, and presented the plan to its employees at "e-Business University," an instructional conference for IBM employees. Jensen attended the conference with over a thousand other salesmen and there received a glossy brochure, entitled "Welcome to the fabulous world of your 2001 Software Sales Incentive Plan," which outlined the Sales Incentive Plan. The brochure trumpeted the simplicity and advantages of the new plan under which a salesman's commissions turn on his success in attaining his sales quota, instead of being calculated as a straight percentage of sales, as they had been before. Announcing its function, the brochure stated: "This booklet explains the basic principles that guided design of the new plan, and provides information to help you understand how the plan works . . . for you and for IBM." Describing the concept of incentives, the brochure stated: "[B]ecause your sales plan is based on a self-funding model, there are no caps to your earnings; the more you sell, the more revenue and incremental profit for IBM; and the more earnings for you." The brochure described how the plan worked, set forth some rates,

and provided a full example of how the income for a hypothetical software account manager is to be computed. It cautioned, however:

> Disclaimer: This example is provided for illustration purposes only. Actual sales incentive payments will be different than the numbers displayed here. In cases of conflict between what is shown in this booklet and local documentation, local plan documentation prevails.

The brochure directed employees to visit the "Sales Incentives" section of IBM's corporate intranet for "lots of useful content that helps you focus on big payout opportunities, and easily calculate your earnings."

The Sales Incentive section of IBM's corporate intranet contained various documents, including one entitled "IBM Software Group 2001 Sales Incentive Plan Management Guide" (commonly referred to as the "Playbook") and one entitled "Field Management Guidance: 2001 Software Sales Incentive Plan." The latter provided in much detail the way in which the Sales Incentive Plan operates and was to be managed. Explaining that it is "a companion piece to the '2001 Software Sales Incentives Plan' booklet," the Field Management Guidance described the implementation and management of the plan under headings such as "Implementing the Incentive Plan," "Determining Eligibility," "Setting Quotas/Targets," "Evaluating Performance and Paying Incentives," and "Achieving a Competitive Distribution of Earnings." The Field Management Guidance concluded with references to additional materials for further information.

The Sales Incentive Plan allowed IBM's separate divisions to individualize a salesman's sales targets and balance his salary and commissions. Accordingly, Doug Martin, Jensen's manager, provided Jensen with an "employee quota letter" tailoring the Sales Incentive Plan to Jensen. Jensen's quota letter identified his sales territory and outlined the structure of the incentive plan as it was applicable to him. The employee quota letter placed Jensen in the 50/50 bracket — 50% salary/50% incentive pay. As the letter explained, Jensen would earn $75,000 as salary and, if he attained 100% of his sales quota — which was fixed at $2.5 million for the year 2001 — he would earn $75,000

as incentive pay, split between $60,000 in commissions and $15,000 in bonus pay. At the bottom of the letter, in bold italics, IBM wrote:

> Right to Modify or Cancel: While IBM's intent is to pay employees covered by this program according to its provisions, this program does not constitute a promise by IBM to make any distributions under it. IBM reserves the right to adjust the program terms or to cancel or otherwise modify the program at any time during the program period, or up until actual payment has been made under the program. Modification or cancellation may be applicable to all persons covered by the program, or to any subset as defined by management. Even though you may be given progress reports regarding plan achievement during the year, no one becomes entitled to any payment in advance of his or her receipt of the payment.

On September 28, 2001, Jensen closed an exceptionally large transaction with the IRS that he determined was worth over $24 million to IBM. Jensen calculated that he would receive approximately $2.6 million in commissions from this transaction. In reaching this figure, Jensen relied on the figures included in the glossy brochure and on the practice that IBM had followed in calculating his commissions during the previous 18 months. The glossy brochure showed that for sales constituting up to 100% of his sales quota, he would receive 1%; for sales amounting to 100 to 125% of his quota, he would receive 4%; and for sales above 125% of his quota, he would receive 6%. In addition, Jensen applied to the $24-million sale a 13.04% reduction, carving out from the gross sale value an amount for maintenance costs that IBM would have to book and incur over the life of the contract. According to Jensen, for other sales that he had made during the previous 18 months — all of which were small by comparison with the IRS transaction — IBM deducted 13.04% as a "maintenance carve." Thus, in estimating his commissions, Jensen reduced the $24 million contract by 13.04% to $20.8 million, and to that number, he applied the commission rates given in the brochure describing the Sales Incentive Plan. Jensen asserts that these calculations resulted in a figure of $2.6 million.

When IBM paid Jensen, however, it awarded him less than $500,000 on the IRS transaction. First, because of the size and com-

plexity of the IRS contract and the requirements of general accounting principles, IBM valued the deal at less than $20 million; Jensen attributes this to IBM's booking a 31% maintenance carve. Also, IBM applied a 200% Rule, also known as the Large Opportunities Clause, which the Field Management Guidance explained as follows:

> Occasionally, a sales employee will be involved in a very unique transaction that is significantly larger than anything anticipated, such as when a rep with a $5M quota has a single transaction that is $12M. Due to the unusual size of these types of transactions compared with the quota assigned, IBM management reserves the right to review any single transaction that results in attainment of 2X quota or greater. Management will decide if an adjustment to the payment is appropriate based on the contribution of the sales employee to that transaction, therefore, managers should fully understand the sales employee's involvement in the transaction. Managers are encouraged to discuss these situations with employees as soon as they are identified, preferably prior to the opportunity closing.

The 200% Rule was also described in the "Playbook." In the Playbook's more particularized description of the 200% Rule, IBM stated that a 1% commission would be paid for that portion of a single sale that exceeds 200% of the salesman's annual quota. Below the 200% level, however, the percentages identified in the glossy sales brochure applied.

Jensen was not aware of the 200% Rule, nor were some of his immediate colleagues, including managers. He was both shocked and angered by IBM's calculation, which amounted to a commission far smaller than he had anticipated. He claimed that he did not become aware of the 200% Rule until October 11, 2001, roughly two weeks after he closed the IRS sale. When IBM first alerted Jensen it was planning on paying him only $500,000, he conducted a lengthy search on the IBM corporate intranet and only then discovered the documents describing the 200% Rule.

Jensen commenced this action for breach of contract, alleging that once he closed the IRS transaction, he became entitled to a commis-

sion, which he computed using the glossy brochure and his quota letter, amounting to $2.6 million. He also alleges that IBM breached its contract with him in carving from the $24 million IRS transaction a 31% maintenance reserve because IBM's course of dealing for other transactions in which Jensen had been involved were booked with only a 13.04% maintenance carve.

On IBM's motion, the district court entered summary judgment in favor of IBM, holding that IBM and Jensen had never entered into a binding contract because there had never been a meeting of the minds as to the shape, extent, and firmness of the commission arrangement. This appeal followed.

II

Jensen contends that specific documents issued by IBM to describe its Sales Incentive Plan — the glossy brochure and his employee quota letter — constituted a unilateral offer by IBM that could ripen into a binding contract if he performed the offer's sole condition of closing a sale. Jensen argues that "IBM made a promise to pay him compensation upon performance of a specified act; the offer made was in reasonably sufficient terms; and Jensen actually performed the act requested," in this case, closing the $24 million sale to the IRS. On this argument, Jensen contends that based on his calculations, allegedly as described in the glossy brochure and his quota letter, he is contractually entitled to $2.6 million in commissions. His argument does not take account of the other documents referred to in the glossy brochure because, he contends, they were not adequately communicated to him.

The legal principles upon which Jensen rests his claim are not in dispute. While both parties agree that Virginia law applies in this diversity case, the principles of Virginia law are representative of contract law generally. An employer can make a unilateral offer to its employees, and the offer becomes a contract when its conditions are fulfilled. *See Nicely v. Bank of Va. Trust Co.*, 277 S.E.2d 209, 212 (Va. 1981) ("Full performance by the employee constitutes acceptance of the offer, and his previously inchoate rights to receive payments under the plan vest and become legally enforceable"). Employers can make unilateral offers even to at-will employees,

whose employment is otherwise without a contract, and these offers can be communicated in employee handbooks. *See Progress Printing Co. v. Nichols*, 421 S.E.2d 428, 430 (Va. 1992) ("Many of the provisions customarily included in an employee handbook are consistent with an at will employment relationship such as policies regarding vacations, severance pay, or employee grievance procedures"). But consistent with the nature of at-will employment, an employer can modify its offer until the offer's conditions are satisfied. At that point, the employee's right under the unilateral contract is deemed to have accrued or become vested, and the employer no longer can modify the terms of the offer. *See id.* ("Normally, the employer retains the right to alter these policies at any time, although rights which have already vested in the employee are enforceable for the period of time during which those rights existed" (citing *Hercules Powder Co. v. Brookfield*, 53 S.E.2d 804, 809 (Va. 1949) and *White v. Fed. Express Corp.*, 729 F. Supp. 1536, 1548-49 (E.D. Va. 1990)); *see also Pitts v. City of Richmond*, 366 S.E.2d 56, 58 (Va. 1988) ("Prior to acceptance by full performance, an employee has no vested rights in the System, and the [employer] is free to modify its provisions"); *Nicely*, 277 S.E.2d at 212 (finding no vested right because the employee had not fully satisfied the conditions placed on his right to receive benefits).

An employer can control when an employee's right to an offer vests by imposing conditions through clear statements in the offer. *See Hepner v. Am. Fidelity Life Ins. Co.*, 258 S.E.2d 508, 512 (Va. 1979) (holding that, although the employee was terminated on November 21, the employer was not bound to pay a bonus for the 12 months ending October 31 because the contract provided that the right would not vest unless the employee was still employed on December 1); *see also Nicely*, 277 S.E.2d at 212 (holding that employer can condition vesting of a right to disability benefits on more than the onset of a disability). But merely including in the offer the general statement that the employer retains the power to alter or end a benefit does not preclude the formation of a contract if the employee satisfies the conditions of the offer before the offer is altered or withdrawn; such a vague statement does no more than restate the employer's common-law right to modify the terms of at-will employment. An employer must use clearer language to change the time when an employee's right vests.

Thus, to succeed on his contract claim, Jensen must show that IBM made an offer, that under the offer he would be paid $2.6 million in commissions on a $24 million sale, that he could and did accept the offer by making the sale, and that his right to that commission vested such that IBM's refusal to pay him the full amount was a breach of contract. Jensen fails on the very first requirement because the documents on which he relies do not manifest IBM's willingness to extend any offer to enter into a contract. The terms of IBM's Sales Incentive Plan make clear that they are not to be construed as an offer that can be accepted to form a contract. *See* Restatement (Second) of Contracts § 24 ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it").

In its employee quota letter sent to Jensen, which Jensen asserts is one of the documents forming IBM's offer to him, IBM states:

> While IBM's intent is to pay employees covered by this program according to its provisions, *this program does not constitute a promise by IBM to make any distributions under it.* IBM reserves the right to adjust the program terms or to cancel or otherwise modify the program at any time during the program period, or up until actual payment has been made under the program. . . . *No one becomes entitled to any payment in advance of his or her receipt of the payment.*

(Emphases added). By this language, IBM did not invite a bargain or manifest a "willingness to enter into a bargain." To the contrary, it manifested its clear intent to preclude the formation of a contract. IBM expressly stated (1) that Jensen could not rely on the intended commissions described in the Sales Incentive Plan "until actual payment has been made"; (2) that IBM could modify or *cancel* the Sales Incentive Plan at any time *before commissions under it are paid*; and (3) that Jensen was not entitled to any payment "in advance of his . . . *receipt of the payment.*" Thus, IBM made clear that there were no conditions that Jensen could satisfy to create a binding contract *before IBM decided to pay him*. IBM unambiguously characterized sales commissions as a form of incentive pay that it intended to make but which it reserved the right to calculate or even not make, *even after sales were closed*.

We agree with the district court that the documents describing IBM's Sales Incentive Plan did not constitute an offer which Jensen could accept to form a binding contract. At most, IBM announced a policy of payment in which it reserved discretion to itself to make the payment and to determine its amount, much like it might handle year-end bonuses.

## III

Even if we overlook the language of Jensen's quota letter in which IBM expresses its intent not to make an offer to enter into a binding contract, Jensen also requires us (1) to overlook the 200% Rule for large transactions that was included in materials posted on IBM's intranet; (2) to incorporate a custom of maintenance carves that existed for the much smaller transactions in which Jensen had been involved during the previous 18 months; and (3) to overlook the provision that in any event IBM's "offer" could be altered at any time before IBM *made payment* to Jensen.

If Jensen advances the glossy brochure describing the Sales Incentive Plan as IBM's offer to him, he must accept the brochure at its word — that it was only a general description of the plan (explaining only its "basic principles") and that the employee should consult the IBM intranet as well as local arrangements authorized under the plan, such as the "Playbook" and his quota letter, for further details. The brochure's reference to these matters amounts to an incorporation by reference to intranet materials that establish a special rate of commissions in "large opportunity" transactions that are "significantly larger than anything anticipated" by the employee's quota letter. These are all terms of the "offer" on which Jensen relies.

Jensen seeks to avoid the terms applicable to large opportunities — the 200% Rule — by arguing that its terms were not effectively communicated to him because they were buried in the intranet materials and he did not find them until after he had made the IRS sale. He also argues that in any event the language of the glossy brochure advertising that commissions were "uncapped" conflicted with the 200% Rule, which he characterizes as a "cap," and that conflicting terms should be construed in his favor. On the lack-of-communication argument, Jensen is imputed with knowledge of what was expressly incor-

porated into the materials describing the plan; the glossy brochure referred him to the intranet materials. That he chose not to read them does not provide a legal excuse to exclude them from the terms of the "offer." And his argument that IBM's advertisement of "uncapped" commissions conflicts with the 200% Rule is simply the product of misreading the 200% Rule. The 200% Rule does not cap Jensen's commissions; it does not impose a ceiling on the amount of sales to which commissions apply. While the 200% Rule's rate of 1% is less than some of the rates on sales under the 200% quota, varying commission rates do not suggest that commissions are capped. As the glossy brochure correctly stated, "your earnings for performance above quota continue to be uncapped in 2001," and the 200% Rule does not conflict with that statement.

Jensen can point to no custom that fixes the maintenance carve as 13.04% for every transaction, however large. He recites only his experience over 18 months that involved much smaller and more uniform transactions. Because the maintenance carve is an accounting reserve for future expenses that must be charged against the gross amount of a contract, IBM maintains that general accounting principles required that it book a 31% maintenance carve for the $24 million contract with the IRS, which required performance over a number of years. Jensen offers no rebuttal to IBM's explanation.

Even if Jensen were correct in reading the 200% Rule as a cap and in holding IBM to a 13.04% maintenance carve, he also does not address why the language of the "offer" — that it does not vest until commissions *are paid* — can be overlooked. It is true that in the absence of such vesting language, a commission might be earned when the sale is made. But the language of the "offer" that he advances imposes a different condition, directing that any right does not vest until commissions are paid. Therefore, IBM would have been within its rights under Jensen's purported contract to introduce the 200% Rule or change its standard maintenance carve for the first time after he closed the IBM deal.

Thus, even taking the IBM descriptions of its Incentive Sales Plan as an offer, Jensen fares no better under its expressed terms. He is bound by both the 200% Rule and by the language that would permit

IBM to impose a 200% Rule even after the sale was made, so long as it is applied before payment is made.

## IV

Jensen treats this case as a dispute over what the contract between him and IBM provided — what was communicated, what was offered to him, what was accepted. Based on the text of the various communications about the Sales Incentive Plan, however, we view this case as an effort by Jensen to create an enforceable contract out of a policy that expressed IBM's contrary intentions. We see IBM's Sales Incentive Plan as no more than an announcement of a policy expressing its intent to pay incentives in specified amounts but retaining full discretion to determine amounts until the time that they are actually paid. Seen in this light, descriptions of the plan did not amount to an offer to enter into a contract, but the announcement of a nonbinding intention, much like that in which an employee is told that he will be paid a bonus if the company does well, without being promised specific amounts. Here, of course, specific amounts were expressed, and, according to IBM, even paid to Jensen. But any disagreement over what was announced does not form the basis for a lawsuit for breach of contract.

If we were to take the plan as an offer, as Jensen urges us to do, he would nonetheless be bound by its full terms and could not select only the terms that he elected to read. Under this assumed analysis, he would fare no better.

At bottom, IBM's Software Sales Incentive Plan expressed only the company's desire and intention to reward Jensen in 2001 based on his overachievement in sales, and when taking into account all of the documents describing the plan, IBM fulfilled its expressed intention, paying him over $1 million in 2001 when his targeted compensation for the year was in the range of $150,000. Whatever acrimony this litigation may have engendered traces only to a misunderstanding of IBM's program, not to the breach of a legal obligation.

*AFFIRMED*