NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0703n.06

Nos. 08-1307, 08-1325

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Oct 29, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| PAMELA S. ANTON, et al., | ) | |
| | ) | |
| **Plaintiffs-Appellees,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| SBC GLOBAL SERVICES, INC., | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | **O P I N I O N** |
| | ) | |
| _____ | ) | |

**Before: MOORE and ROGERS, Circuit Judges; THAPAR,** [*] **District Judge.**

**THAPAR, District Judge.** At issue in this appeal is whether the amount that a jury awarded

two former sales representatives of SBC Global Services, Inc. ("SBC"), in sales commissions should

be lowered or reconsidered by the district court. The parties agree that after the plaintiffs, Pamela

S. Anton and Cheryl F. Snipes, helped SBC secure a contract with Colin Communications, Inc.

("CCI"), they were owed sales commissions under an implied-in-fact contract with SBC. The

parties, however, dispute the terms of that implied-in-fact contract and, in turn, how much the

plaintiffs are owed in sales commissions for securing the CCI contract. At trial, the jury resolved

this dispute by awarding Anton $3,191,400 and Snipes $3,510,540. The district court rejected SBC's

_____

[*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

arguments, made in its two post-trial motions, that these awards should be lowered or reconsidered as a matter of law. We affirm.

## I.

SBC sells, among other things, various data products and services. Anton was an SBC sales representative and worked on a commission basis. Snipes was a manager who managed the sales of service contracts to certain accounts, including CCI. She also worked on a commission basis.

In 2000, Anton and Snipes worked together to secure a large services contract with CCI (the "CCI Agreement"). While they were trying to secure this contract, various members of SBC management implied that Anton and Snipes each would be due for a large commission. For example, Snipes' manager suggested that the contract was worth $200 million to $1 billion. Similar estimations were sent out in internal SBC emails. SBC internally characterized the CCI Agreement as a "one billion dollar agreement and/or a deal worth in excess of $1 billion." SBC management made comments about the large commissions the plaintiffs were going to get from the CCI Agreement and how "rich" Anton and Snipes would be because of the commissions.

On June 29, 2000, SBC and CCI entered into the CCI Agreement. The contract required CCI to order and have installed an increasing number of DSL lines each year for four years. This contract was different from the previous contracts the plaintiffs sold, since CCI was not the actual end customer. Rather, CCI, acting as a "middle man," would find end customers for SBC's services. Additionally, there was a liquidated damages provision in the CCI Agreement, which seemed to limit CCI's liability to $15 million if CCI could not meet certain thresholds.

No one disputes that Anton and Snipes were each entitled to a commission when the CCI Agreement was signed. The parties dispute how much the plaintiffs were each entitled. Though

2

Anton's commission rate at the time of the CCI Agreement was 0.60 percent of a contract's life-cycle revenue ("LCR")[1] and Snipes's was 0.66 percent, SBC offered the plaintiffs commissions for the CCI Agreement under markedly different terms. On October 18, 2000, SBC notified Anton that her commission for the CCI Agreement would be $24,000 and $1 for each DSL line installed in the first year of the contract. Anton also got a quarter multiplier bonus at the rate of 21 percent based on her commissions for the second quarter of 2000, including her commissions of $24,000 on the CCI Agreement. In the alternative, SBC offered to revisit the commission calculation and consider a commission based on the LCR. SBC calculated the LCR to be $15 million because of the liquidated damages clause in the CCI Agreement. Under that alternative commission, SBC stated that Anton would get $90,000. On November 13, 2000, SBC notified Snipes that her commission for the CCI Agreement would be $12,000 and $2 for each DSL line installed in the first year of the CCI Agreement. Similar to Anton, SBC offered to revisit the issue and consider giving Snipes her commission based on a $15 million LCR. In that alternative, SBC stated Snipes' commission would be $78,000.

However, Anton and Snipes believed that their commissions would be based on a $1.08 billion LCR and their respective commission rates of 0.60 percent and 0.66 percent. With that in

---

[1]LCR is the product of three things: (1) the number of months in the contract's term, (2) the number of lines, and (3) the monthly fee per line. Some at SBC called the LCR the "potential" or "projected" value of the contract. Generally, SBC's Contract Information Management Group made the initial calculations of the LCR. The commissions were calculated "on contract," meaning commissions were earned and paid immediately after the contract was executed. The amount of revenue actually received by SBC as a result of the contract was irrelevant to calculating the LCR. While other contracts the plaintiffs secured contained liquidated damages clauses, these clauses did not affect how the LCR was calculated.

mind, Anton expected roughly $6 million in commissions for the CCI Agreement and Snipes roughly $6.6 million. Thus, the plaintiffs rejected SBC's commission decisions.

In letters to the plaintiffs, SBC justified the commissions that they offered the plaintiffs by citing the terms of its Sales Compensation Plan and the associated Administrative Guidelines (collectively referred to as "the Plan"). In particular, SBC noted a provision in the Plan which states that its Sales Compensation Team ("SCT") will "determine the commission payment" for contracts with an LCR greater than $2 million. Since it was undisputed that the LCR at issue was larger than $2 million, SBC argued that the large sales provision gave the SCT discretion to determine the amount of commissions to which the plaintiffs were entitled for the CCI Agreement. In essence, SBC claimed that under the Plan's large sales' provision it was not required to apply the plaintiffs' commission rates to the contracts' LCRs.

Subsequently, Anton and Snipes individually filed lawsuits in October of 2000, but the district court consolidated their cases for pre-trial proceedings and trial. On October 6, 2004, the district court granted summary judgment for the defendant on all of the plaintiffs' claims except the breach of implied contract claim. The implied contract claim went to trial in August 2007.

At trial, the parties stipulated to many facts. Most importantly, the parties stipulated to the existence of an implied-in-fact contract that required both Anton and Snipes to be paid some commissions based on the CCI Agreement. Thus, the dispute at trial boiled down to what the terms of that implied-in-fact contract were, and what commissions the plaintiffs were owed under those terms for their work in securing the CCI Agreement. Following a 12-day jury trial in August 2007, SBC filed a motion for judgment as a matter of law. The district court denied the motion. The next

day, on August 28, 2007, the jury returned a verdict in favor of the plaintiffs. Anton was awarded $3,191,400 and Snipes was awarded $3,510,540.

Following trial, SBC filed a renewed motion for judgement as a matter of law or, in the alternative, for a new trial. SBC also filed a motion for remittitur. Both motions were denied and now form the basis of this appeal.

## II.

SBC argues that the jury's verdict should be reversed because a reasonable jury would have applied its interpretation of the implied-in-fact contract. SBC is incorrect. When viewing the evidence in the light most favorable to the plaintiffs, *see Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 192 (Mich. 2003) (holding that evidence and all legitimate inferences are viewed in the light most favorable to the nonmoving party), sufficient evidence existed to sustain the jury's interpretation of the contract and, in turn, its verdict, *see Toth v. Yoder Co.*, 749 F.2d 1190, 1194 (6th Cir.1984) (stating that under Michigan law, a judgment as a matter of law may be granted only if "reasonable minds could not differ as to the conclusions to be drawn from the evidence" (citing *Gilham v. Admiral Corp.*, 523 F.2d 102, 109 (6th Cir. 1975))).[2]

### A. SBC's Discretion for Large Sales

SBC argues that under the terms of the implied-in-fact contract with the plaintiffs it had discretion to set the commission for large sales at a rate different from the commission for smaller

---

[2]In a diversity case, we apply state law—in this case Michigan law—to determine the standard of review for a motion for judgment as a matter of law. *Ridgway v. Ford Dealer Computer Servs., Inc.*, 114 F.3d 94, 97 n.3 (6th Cir. 1997) (noting that Sixth Circuit precedent conflicts with other circuits and some leading treatises which apply federal law for the standard of review).

sales. The jury, however, determined otherwise, and its determination was supported by evidence presented at trial.

Under Michigan law, the terms of an implied-in-fact contract are "determined by [the parties'] conduct or other pertinent circumstances surrounding the transaction." *Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 504 (6th Cir. 1995) (citing *Erickson v. Goodell Oil Co.*, 180 N.W.2d 798 (Mich. 1970)). "In deciding whether there was mutual assent to [an implied contract term], [Michigan courts] use an objective test, 'looking to the expressed words of the parties and *their visible acts*.'" *Rowe v. Montgomery Ward & Co., Inc.,* 473 N.W.2d 268, 273 (Mich. 1991) (emphasis in original) (citations omitted). In this case, to determine whether there was assent to a term, the jury had to look at how a reasonable person in Anton's and Snipes's position would have interpreted SBC's statements or conduct. *Rood v. General Dynamics Corp.*, 507 N.W.2d 591, 598 (Mich. 1993) ("In deciding whether a party has assented to a contract, we follow the objective theory of assent, focusing on how a reasonable person in the position of the promisee would have interpreted the promisor's statements or conduct." (citation omitted)).

In this case, the parties' conduct and the circumstances surrounding the transaction demonstrate that the jury had a reasonable basis to conclude that the implied-in-fact contract did not give SBC discretion over the amount of commissions. In particular, this is established by three pieces of evidence: prior commissions for contracts (i.e., course of dealing evidence), the Plan's terms themselves, and the statements of SBC management.

### 1. Prior Commissions

Before the CCI Agreement, SBC had paid the plaintiffs' commissions based on each signed contract's LCR, including three such contracts with CCI. Anton never had a commission lowered.

6

Thus, it was completely reasonable for her to assume, and a jury to conclude, that her commission for the CCI deal would be calculated exactly as it had been in the past.

With respect to Snipes, however, SBC contends that at the very least Snipes understood that not all contracts were paid pursuant to their LCRs'. SBC points out that its Sales Compensation Team reviewed two of Snipes's "large sales" and, in one case, made a "downward adjustment" to the LCR calculation. SBC's argument fails because a jury could reasonably conclude that Snipes saw the Sales Compensation Team's review as merely a means to verify that commissions were calculated correctly for large contracts—not to give SBC discretion over commissions for large contracts.

Indeed, in the case where SBC made a downward adjustment, it did so because the LCR was incorrectly calculated, not because it was exercising its discretion to reduce the commission. Laura Pike, Associate Director of Compensation at SBC, testified that SBC lowered that commission because a portion of the signed contract, equipment sales, was not eligible for compensation. Pike further testified that SBC often gave commissions pursuant to LCR even when it reviewed large sales. Thus, it was reasonable for a jury to conclude that Snipes understood that SBC's review of large sales was to check for errors in the calculations of commissions—not to give SBC discretion to reduce the commissions.

SBC cites *Dyer v. Michigan Department of State Police*, 326 N.W.2d 447 (Mich. Ct. App. 1982), for the proposition that no implied right is created based on custom where there is a conflicting express policy of the employer. In *Dyer*, the question was whether police officers could use work vehicles for personal use since they had been allowed to in the past even though an express policy prohibited such use. *See id.* at 449-50. The court found that the previous personal use did

7

not affect the binding nature of the express policy for two reasons: (1) the rights and duties of the parties were "not regulated by implication [but rather] they are controlled by the express terms of the official policy statements" and (2) the consent to use the vehicles for personal use was given by supervisors who went beyond their authority. *Id.*

The instant case is distinguishable. First, no express contract exists. In fact, the parties have stipulated that they have agreed to an *implied*-in-fact contract. Therefore, unlike in *Dyer*, the parties here *are* regulated by implication—not necessarily the express terms of the Plan. Additionally, SBC itself established the custom of calculating sales commissions based on each contract's LCR. SBC has not argued that there was improper consent to the payment terms of previous contracts. The terms of the policy in *Dyer* clearly prohibited personal use of the work vehicles, whereas here the terms of SBC's Plan have two possible interpretations. Thus, the reasoning in *Dyer* does not support SBC's position.

SBC also cites *Jensen v. IBM Corp.*, 454 F.3d 382 (4th Cir. 2006), to support its position that custom should not be a basis for determining the terms of the implied-in-fact contract. *Jensen* is inapposite since it does not address whether custom could be a basis for construing the terms of an implied-in-fact contract.

In short, SBC provides no Michigan law that illustrates why custom or course of dealing evidence should not govern the implied contract at issue here. Thus, the custom and course of dealing evidence introduced in this case supports the jury's conclusion that SBC did not have discretion over the size of commissions.

### 2. The Plan's Terms

SBC maintains that all of the previous commissions were consistent with the Plan's terms and, hence, its terms or, stated more accurately, SBC's interpretation of the Plan's terms governed the commissions for the CCI Agreement. SBC fails to demonstrate that a reasonable jury must conclude that the plaintiffs had knowledge of the large sales provision in the Plan. However, even if the plaintiffs were aware of its terms, SBC fails to show that a reasonable jury must conclude that the plaintiffs assented to SBC's interpretation of the provision.

There were ample facts in the record from which the jury could reasonably conclude that Anton was unaware of the large sales provision, and thus, could not have assented to it. SBC argues that Anton should have been aware that she was bound to the Plan's terms because her June 10, 1999, offer letter refers to it. The letter, in part, states:

> In addition to your base salary, you will participate in the GBS 1999 Solutions Consultant-Data Compensation Plan (your manager will provide details of the plan administration).

Anton requested the Plan from her manager at the time, but there is no evidence that she received the Plan. When she asked for the Plan, her manager told her that her commissions were paid based on LCR. No one told her that large sales would be compensated differently.

SBC also claims that Anton accessed the database containing the Plan right before the CCI Agreement was signed and, thus, was aware of its terms. But Anton testified that she only accessed the database to get pricing information and was unaware that the Plan's compensation terms were also there. Further, SBC points out that it emailed "compensation banners" to sales employees, which contained a link to the Plan. This is the strongest evidence that could show Anton was aware the Plan could be accessed electronically. Still, there was no proof that Anton received these emails. Moreover, SBC did not require the plaintiffs to sign a statement acknowledging receipt of the Plan,

as had been the practice in years before their employment and since the CCI Agreement. This fact provides further support that SBC has failed to show that a reasonable jury must find that Anton had knowledge of the Plan's terms.

With respect to Snipes, the evidence showed that she at least had some knowledge of the Plan's terms and how to access them. Unlike Anton, Snipes acknowledged that she accessed and viewed the Plan on Lotus Notes in March 2000 before the CCI Agreement was signed. She "breezed through the [Plan]" but testified that she did not come across the large sales provision. In addition, unlike Anton, Snipes acknowledged receiving the compensation banner emails that had links to the Plan. Thus, a reasonable jury must conclude that Snipes had at least some knowledge of the Plan and its terms—clearly more than Anton. Nonetheless, given that the Plan's terms were sufficiently vague and the other evidence in the plaintiffs' favor, Snipes' mere knowledge of the Plan's terms is not enough to overturn the jury's verdict.

SBC responds that the plaintiffs' subjective interpretations of the Plan are not relevant here since the terms are clear and unambiguous. *See L & S Bearing Co. v. Morton Bearing Co.*, 93 N.W.2d 899, 901 (Mich. 1959) ("In Michigan the law is clear that where a written contract is not ambiguous the intention of the parties as expressed on the face thereof must be followed . . . ."). In other words, SBC argues that knowledge of the terms is enough to bind the plaintiffs since the terms are unambiguous. But the large sales provision[3] merely states that sales with an LCR greater than $2 million will be "reviewed by the BCS Sales Compensation Team (SCT) to determine the

---

[3]SBC also cites a clause in the Plan that states that its Sales Compensation Team can "[r]esolve any and all sales credit . . . situations." Like the large sales provision, this clause is ambiguous. After reading this clause, a reasonable person would not necessarily conclude that SBC had discretion to reduce the plaintiffs' commissions for large contracts.

10

commission payment." Even if a reasonable person read this provision, she could come to the conclusion that SBC reviewed large contracts to ensure correct calculations of commissions—not to devise a new commission scheme.

Based on *Jensen,* SBC argues that the parties' implied-in-fact contract cannot conflict with an express policy of SBC—i.e., the Plan. On the surface, *Jensen* has similar facts to the case at hand, but the material facts are distinct. Similar to Anton and Snipes, the plaintiff in *Jensen* felt that he was under-compensated for a large contract that he secured for IBM. 454 F.3d at 385-86. He did not agree with his sales commissions, which were a smaller percentage than what he had previously received and, hence, filed suit against IBM. *Id.* at 386. Like SBC, IBM alleged that it treated large sales differently. *Id.* Jensen based his contract claim, in part, on a "glossy brochure" that IBM provided and "his employee quota letter." *Id.* at 386. In addition, he pointed out the higher commission rates he had received on smaller contracts.

In the instant case, Anton and Snipes have not alleged that the terms of the implied-in-fact contract come from SBC documentation, like the plaintiff in *Jensen* did. There, the *Jensen* court stated that the plaintiff could not use only the sections of an employer's policy that he agreed with and disregard those sections that were not in his favor. *Id.* at 389-90. To that end, IBM's policy expressly stated that it was making no offer and incorporated by reference provisions that mentioned its intention to limit commissions for large sales. *Id.* at 387-89. Here, there is no express contract,

11

but rather a question over the terms of an implied contract.[4] The plaintiffs do not argue that the Plan should decide the terms. SBC does. Hence, the facts of *Jensen* are materially different.

Separately, SBC argues, based on *Mannix v. County of Monroe*, 348 F.3d 526 (6th Cir. 2003), that "reasonable notice" was sufficient to bind Anton and Snipes to its interpretation of the Plan. Specifically, SBC contends that having the Plan on an electronic Lotus Notes database was sufficient to bind Anton and Snipes to its interpretation of the Plan's terms. *Mannix*, however, was a legitimate expectation case and, thus, the terms were decided based on an employer's promises to the workforce in general; the instant case is one of implied-in-fact contract and thus the terms are decided based on what Anton and Snipes reasonably believed them to be in light of SBC's statements and conduct—not necessarily SBC's promises to the entire workforce. *See Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 550 (Mich. Ct. App. 1999) (stating that a legitimate expectations claim rests on "the employer's promises to the work force in general-for example, promises contained in a company handbook-rather than on promises made to an individual employee" (citing *Nieves v. Bell Indus., Inc.*, 517 N.W.2d 235 (Mich. Ct. App. 1994); *Dolan v. Cont'l Airlines/Cont'l Express*, 563 N.W.2d 23 (Mich. 1997))). Thus, *Mannix* is inapplicable.[5]

---

[4]SBC believes that *Brozo v. Oracle Corp.*, 324 F.3d 661 (8th Cir. 2003) also assists it in arguing that, when an express policy is in place, an employee cannot, as a matter of law, recover commissions on a theory that is contrary to that policy. The question in *Brozo* was whether the contract terms were ambiguous. *Id.* at 665. *Brozo* is inapposite because it is not clear that an express policy was in place at SBC. The question before the jury here was what terms the plaintiffs reasonably believed they assented to based on SBC's statements and conduct. Thus, the inquiry here is broader than that in *Brozo*. Also, unlike the policy in *Brozo*, the Plan's large sales provision is ambiguous, as the plaintiffs' and SBC's interpretations of the provision are both reasonable.

[5]SBC also asserts, based on *Grow v. General Products, Inc.*, 457 N.W.2d 167 (Mich. Ct. App. 1990), that general circulation of the Plan was enough to bind Anton and Snipes to the terms. In *Grow*, the employer sent a memo around that stated employment was at-will. *Id.* at 168. While *Grow* involved a claim for an implied contract for just cause employment, it nevertheless involved a different inquiry than the instant case. For the same reasons that *Mannix* is inapplicable, *Grow* is also

SBC counters that *Mannix* is applicable since it cites *Rowe,* which involved an implied-in-fact contract claim. But *Rowe* is distinguishable from the instant case as well. The question in *Rowe* was "whether an employer's oral statements and written policy statements created an employment contract terminable only for cause." *Rowe*, 473 N.W.2d at 269-70. Under Michigan law, there is a presumption that employment is at will. *Id.* at 271-72. The presumption can be overcome if there is an express contract stating otherwise or if there is proof of a "promise implied in fact" stating otherwise. *Id.* at 271. The plaintiff in *Rowe* believed that the employer's oral statements amounted to a contract to terminate only for just cause. *Id.* at 272.

While the court in *Rowe* applied the same test the jury did here, *see id.* at 273, *Rowe* is distinct for three reasons.[6] First, the employee in *Rowe* had to overcome the presumption of employment at will. Here, there is no presumption that SBC's interpretation of the Plan should apply. Rather, the parties have agreed that there is an implied-in-fact contract and the terms are in dispute. Second, Anton and Snipes are relying on more than oral statements; they also have course of dealing evidence in their favor. There was no course of dealing evidence in *Rowe*. Finally, SBC's attempt to analogize the Plan to the handbooks sent to employees in *Rowe* fails. Unlike the plaintiff in *Rowe*, Anton may have not received the Plan. *See id.* at 276 (mentioning that "the last handbook which plaintiff received clearly set forth an employment-at-will policy"). In addition, the plaintiffs here could have reasonably interpreted the Plan differently than SBC did. As has been discussed,

inapplicable.

[6]The first two reasons that distinguish *Rowe* also serve to further distinguish *Mannix* from the instant case. Specifically, the plaintiff in *Mannix* similarly had to overcome a presumption of employment at will, and he had no course of dealing evidence to support his claim. In the instant case, there is no similar presumption at issue and the plaintiffs have significant amounts of course of dealing evidence in their favor.

13

the plaintiffs had a reasonable basis for concluding that SBC merely reviewed large contracts to ensure that commissions were calculated correctly—not to reduce or adjust the commissions scheme for the contracts. On the other hand, the handbooks in *Rowe* clearly stated that employment was at will, so that was the only reasonable interpretation of the handbooks. *Id.* at 270. Ultimately, *Rowe* is distinct from the instant case.

### 3. SBC Management's Statements

The statements of SBC management, before the CCI Agreement was signed, also support the plaintiffs' interpretation of the contract's terms. While Anton and Snipes were closing the CCI contract, various members of SBC management implied that Anton and Snipes would be due for a large commission. For example, Snipes' manager suggested that the contract was worth $200 million to $1 billion. Similar estimates were sent out in internal SBC emails. Likewise, SBC management made comments about the large commissions the plaintiffs were going to get from the CCI Agreement and how "rich" they would be. These statements did not put the plaintiffs on notice that they were going to receive only $12,000 and $24,000, respectively, for a billion dollar contract. Ultimately, these statements further support the conclusion that the jury reached a reasonable verdict.

### B. Mutual Assent

SBC also contends that the district court should be reversed as a matter of law because there was no evidentiary basis to find that SBC mutually assented to the terms the plaintiffs assert. SBC misinterprets Michigan law in this regard.

SBC claims that it did not provide "expressed words" or "visible acts" that could result in the plaintiffs' interpretation of the contract. *See Rood*, 507 N.W.2d at 598. While SBC may not have subjectively believed it assented to those terms, that is not the test under Michigan law when

14

deciding the terms of an implied-in-fact contract. After considering the parties' "expressed words . . . and their visible acts," the jury had to "ask whether a reasonable person could have interpreted the words or conduct in the manner that is alleged [by the plaintiffs]." *Id.* Given how the previous commissions were paid, the Plan's vague terms, and the statements of SBC management, SBC did provide "expressed words" or "visible acts" to support the jury's verdict.

At the same time, SBC also asserts that the plaintiffs' subjective belief of the contract terms is irrelevant. Again, SBC misstates the law. It is true the plaintiffs' subjective beliefs themselves cannot dictate the terms of the implied-in-fact contract; however, since their beliefs were reasonably grounded in SBC's statements and conduct the jury could use the plaintiffs' beliefs to construe the terms of the implied contract.

## C. The Effect of the CCI Agreement's Terms

SBC asks the Court to look to the terms of the contract with CCI when deciding whether the jury's awards should be lowered or reconsidered by the district court. Specifically, SBC argues that the CCI Agreement was unique because it was "wholesale" and CCI was not the end customer of SBC's services. Thus, the course of dealing evidence that involved "standard" contracts was irrelevant. In the alternative, SBC believes that the LCR calculation should be capped at $15 million in light of a liquidated damages clause in the CCI Agreement. Both of these arguments lack merit.

### 1. The "Wholesale" Nature of the Contract and Actual Revenue Earned by SBC

SBC contends that the CCI Agreement was different from the "standard" contracts that Anton and Snipes had secured in the past, and thus, the course of dealing evidence is irrelevant here. The contract is apparently a "wholesale" contract since SBC is not selling directly to the end customer. Rather, CCI is selling the services to end customers and will be more like a "middle man" for SBC.

15

Because of the "wholesale" nature, SBC argues that the actual revenue earned by the contract should be a factor in the commissions' calculations. Even if the course of dealing evidence was not applied, the other evidence shows that a jury could reasonably conclude that the plaintiffs should not be paid differently for this contract. No statements by SBC's management to Anton or Snipes imply that this contract or other "wholesale" contracts would be commissioned differently. In addition, the Plan does not state that "wholesale" contracts will get lower or different commissions than "standard" contracts. Similarly, none of Anton and Snipes' previous commissions were paid based on the actual revenue the underlying contract earned. Their commissions were calculated when the sale was executed–often before SBC knew what revenue would be earned. Moreover, the jury's verdict is reasonable even if the course of dealing evidence is not considered.

### 2. The Liquidated Damages Clause

In the alternative, SBC asserts that the LCR should be calculated based on the CCI Agreement's $15 million liquidated damages clause. SBC contends that the contract's potential value should not be the basis for any calculation of damages since CCI was not liable for this amount. However, when SBC paid the plaintiffs their commissions for signed contracts prior to the CCI Agreement, it never took into account the contracts' liquidated damages clauses. Additionally, SBC never had considered what amount the customer was actually liable for, or if the revenue projections were speculative. Even looking at the terms of the Plan, as SBC repeatedly urges us to do, no mention is made of: (1) how a liquidated damages clause affects sales commissions or (2) how the speculative nature of revenue projections affects sales commissions. In other words, neither the parties' course of dealing nor the language of the Plan makes a liquidated damages clause a factor

16

in LCR calculations. Consequently, the jury acted reasonably in concluding that the liquidated damages clause should play no role in calculating the plaintiffs' commissions.

### D. Motion for Remittitur

SBC also appeals the district court's denial of its request for remittitur. In reviewing the size of jury verdicts, we apply federal law. *See Donovan v. Penn Shipping Co., Inc.*, 429 U.S. 648, 649-650 (1977). Thus, we review the denial of a motion for remittitur for abuse of discretion, and we view the facts in the light most favorable to the plaintiffs since they prevailed at trial. *Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 509 (6th Cir. 2005). As part of this request, SBC again asks that the commissions be calculated based on the liquidated damage clause (thereby limiting the LCR of the CCI Agreement to $15 million), or in the alternative, for a partial new trial on damages. For the reasons provided above, this argument lacks merit. In addition, in its motion for remittitur, SBC argues the jury's award was speculative. Once again, SBC is incorrect.

First, using the potential value of the contract is a reasonable interpretation of the implied contract between SBC and the plaintiffs. While the plaintiffs must prove their breach of contract damages "with reasonable certainty" and without speculation or conjecture, it is not necessary that they do so with "mathematical precision." *Hofmann v. Auto Club Ins. Ass'n*, 535 N.W.2d 529, 554-55 (Mich. Ct. App. 1995) (citing *S.C. Gray, Inc. v. Ford Motor Co.*, 286 N.W.2d 34 (Mich. Ct. App. 1979); *Sutter v. Biggs*, 139 N.W.2d 684 (Mich. 1966); *Godwin v. Ace Iron & Metal Co.*, 137 N.W.2d 151 (Mich. Ct. App. 1965)). Still, under Michigan law, the jury's inquiry here was what Anton and Snipes reasonably believed the terms of the implied-in-fact contract were, and, on that basis, what commissions are owed to them for the CCI Agreement. There is evidence supporting the conclusion

17

that the parties agreed to large commissions. Such an agreement does not make the jury award unreasonable. The plaintiffs presented evidence that the contract could be valued as high as $1.08 billion. Most significantly, SBC stipulated that the contract was internally characterized as a "one billion dollar agreement and/or a deal worth in excess of $1 billion." SBC has not demonstrated how the commissions were speculative, only stating that there was only a possibility that CCI would order $531 million worth of orders. Thus, SBC cannot fault the jury since SBC agreed to a contract that allowed for commissions based on projections—not actual revenue.

Further, SBC argues that a reasonable jury could not find the LCR to be $531 million because, to do so, a jury would need to assume a steady monthly growth of orders. SBC contends that the testimony and evidence did not support such a conclusion, or—in its own words—the use of a "straight line" economic model. SBC believes that the evidence was not sufficient since it did not address the "critical factors" to make use of such evidence. SBC is wrong, as there was significant evidence that did support the jury's verdict. There were several witnesses who stated that the value of the CCI Agreement was between $200 million and $1 billion. As has been mentioned, SBC stipulated that internally the CCI Agreement was characterized as a billion-dollar agreement. The test before us is whether the jury was reasonable in concluding that the agreement was valued at $531 million. There was evidence that SBC believed the agreement to be worth around $1 billion and that, in previous agreements involving the plaintiffs, these types of projections formed the basis of their LCR calculations. Therefore, the district court did not abuse its discretion in denying the SBC's motion for remittitur.

**III.**

For the foregoing reasons, we affirm.

18