**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1406**

APRIL M.A. DODGE,

              Plaintiff - Appellee,

       v.

CDW GOVERNMENT, INCORPORATED,

              Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony J. Trenga, District Judge. (1:09-cv-00528-AJT-IDD)

Argued: January 25, 2011              Decided: March 9, 2011

Before MOTZ and WYNN, Circuit Judges, and Irene C. BERGER, United States District Judge for the Southern District of West Virginia, sitting by designation.

Reversed by unpublished per curiam opinion.

John Kuropatkin Roche, PERKINS COIE LLP, Washington, D.C., for Appellant. Paul A. Prados, DAY & JOHNS, PLLC, Fairfax, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

April M.A. Dodge brought this breach of contract action against CDW-Government, Inc. ("CDW-G") for unpaid commission. After a bench trial, the district court awarded judgment on one claim to Dodge. For the reasons that follow, we reverse.

## I.

The parties do not dispute the relevant facts.

In February 2003, Dodge began work as an at-will technology sales account manager for CDW-G. When Dodge joined CDW-G, she received a document entitled "Welcome to the CDW-G Account Management Team" (hereinafter "Welcome Document"), which specified that Dodge's commission level "adjusts based on ongoing adjusted average gross profit dollars." In the Welcome Document, CDW-G described the salary and commission it intended to pay Dodge but expressly cautioned that the Welcome Document did "not constitute or represent any contractual commitments." The Welcome Document explained that the "[f]ull details of all CDW-G information" were set forth in the "CDW Sales Guidelines and Procedures" (hereinafter "Handbook"), a copy of which Dodge received at that time.

Like the Welcome Document, the Handbook disclaimed any intention by CDW-G to enter into a contract. Indeed, at the very outset, the preface of the Handbook stated that its

2

"contents . . . are presented as a matter of information only and do not create a contract."  The Handbook further declared that "[n]one of the . . . benefits described in this or any other handbook are intended to . . . confer any rights or privileges," including any right to "remain employed by CDW . . . at any level of compensation."  The main text of the Handbook went on to state that "Account Managers are paid on the Account Manager Commission Matrix."  That matrix, in turn, set forth various commission levels corresponding to levels of experience and gross profit figures.  Additionally, the Handbook explained that CDW-G tracked sales on a monthly basis and paid commissions each month based on the previous month's sales.

In July 2004, Dodge participated in a meeting in which Max Petersen, CDW-G's Senior Vice President of Sales, gave a Powerpoint presentation entitled "2004 Federal Comp Plan Update."  At that meeting, Petersen presented a "new federal matrix" designed to "simplify" the old matrix and "motivate" CDW-G's salesforce.  This new matrix, like the old matrix set forth in the Handbook, consisted of a table of commission rates pegged to various experience levels and gross profit figures.  Petersen did not expressly reference the Handbook's previous disclaimers, nor did the Powerpoint presentation contain any disclaimers of its own.  Following the Powerpoint presentation, Dodge received a copy of the new federal matrix.

3

On or about September 30, 2004, Dodge secured two purchase orders from the Defense Contract Management Agency. The first order involved the Agency's agreement to purchase $1.6 million of BlackBerry devices ("BlackBerry Sale") from CDW-G, and the second involved the Agency's agreement to purchase $2.56 million of computer monitors ("Monitor Sale") from CDW-G. Very soon thereafter, on November 24, 2004, CDW-G shipped and invoiced the Blackberries; the next month it paid Dodge a 19% commission on that sale. Before doing so, CDW-G reduced by $60,000 the "adjusted gross profit" figure used to calculate Dodge's commission; the reduction assertedly reflected the contributions of another CDW-G employee.

CDW-G did not begin to ship the Monitors until at least late April 2005. According to the matrix distributed at the 2004 presentation, Dodge should have received a 19% commission on the Monitor Sale. Instead, CDW-G paid her only a 10% commission (in three monthly installments) totaling $81,727. Had CDW-G paid her at the 19% rate, Dodge would have received an additional $76,689.

On May 16, 2008, Dodge sued CDW-G for breach of contract, seeking unpaid commissions on both the BlackBerry Sale and the Monitor Sale. After a bench trial, the district court held that the 2004 Powerpoint presentation qualified as a binding contract offer to pay Dodge a 19% commission on future sales.

4

Accordingly, the district court found for Dodge with respect to the Monitor Sale and awarded her $76,689 in damages. The district court concluded that Dodge's claim pertaining to the BlackBerry sale was time-barred.

Only CDW-G appeals. Thus, only the Monitor Sale is at issue before us. We review the district court's factual conclusions for clear error and its legal conclusions de novo. See Roanoke Cement Co. v. Falk Corp., 413 F.3d 431, 433 (4th Cir. 2005).

## II.

CDW-G maintains that its representations to Dodge regarding her commission do not set forth an offer giving rise to a binding contract.[1] According to CDW-G, it had no contractual obligation to pay Dodge any commission at all, including the 10% commission that it ultimately did provide her in connection with the Monitor Sale.

Under Virginia law, which the parties agree governs this dispute, a promise to pay commissions can form a unilateral contract even when made to at-will employees. See Hercules

---

[1] CDW-G alternatively contends that it modified the terms of any contract prior to Dodge's performance, and that Dodge's claim regarding the Monitor Sale is time-barred. Because we hold that CDW-G had no contractual obligation to pay Dodge any commission, we do not reach these arguments.

5

Powder Co. v. Brookfield, 53 S.E.2d 804, 808 (Va. 1949). But not every statement professing an employer's future intention to pay benefits commits that employer to a binding contract. See Jensen v. IBM Corp., 454 F.3d 382 (4th Cir. 2006). To the contrary, a statement constitutes a contract offer only if it "manifest[s] a willingness to enter into a bargain." Id. at 388 (internal quotation omitted). Thus, we held in Jensen that IBM's "Software Sales Incentive Plan," which pegged employees' commissions to their ability to meet sales quotas, did not set forth an offer providing the basis for a binding contract but instead "announced a policy of payment in which [IBM] reserved discretion to itself to make the payment." Id. at 384, 388. In doing so, we observed that IBM's disclaimer -- stating in part that "this program does not constitute a promise by IBM to make any distributions under it" -- "manifested [IBM's] clear intent to preclude the formation of a contract." Id. at 388 (emphasis omitted).

Here, the district court acknowledged that CDW-G's Handbook contained similar disclaimers and so did not establish the basis for a contract.[2] The court nonetheless found for Dodge, holding

---

[2] In her appellate brief, Dodge made a passing attempt to characterize the Handbook's disclaimers as insufficient. She also contended at oral argument that the Handbook's statement that account managers are "guaranteed" a certain "minimum commission level" overrides those disclaimers. We reject these
(Continued)

6

that the Handbook's disclaimers "did not insulate CDW-G from the contractual consequences" of the "unqualified federal matrix" later presented to Dodge the 2004 Powerpoint presentation.

We disagree. At the time of the 2004 presentation, the Handbook's disclaimers governed CDW-G's payment of commissions, and nothing said at the 2004 presentation eroded the force of those disclaimers. The Powerpoint presentation on which Dodge relies -- articulating CDW-G's "new federal matrix" -- merely set forth a numerical table of commission rates beside bulleted explanations of those rates. This new matrix altered only the old matrix contained in the Handbook; it evinced no intent to transform CDW-G's commission policy from a non-binding informational statement into a contract offer.

To be sure, the 2004 Powerpoint presentation never expressly repeated the Handbook's disclaimers. Such repetition was unnecessary, however, because the 2004 presentation functioned not as an independent offer but as a modification of the Handbook. Indeed, CDW-G called its new commission matrix a "sales plan update," and the Powerpoint presentation made explicit that the "new federal matrix" on which Dodge relies

---

arguments. The Handbook contains numerous explicit disclaimers making clear that its description of CDW-G's commission policy -- including use of the term "guaranteed" -- qualified as "information only" and did "not create a contract."

7

simply replaced the "old" matrix contained in the Handbook. The "sales plan changes" that resulted in the new matrix were just that -- "changes" to the sales plan articulated by the Handbook.

The district court's statute of limitations analysis provides additional support for this conclusion. In rejecting Dodge's Blackberry claim as untimely, the court found that the 2004 presentation formed an oral, rather than written, contract subject to a stricter three-year statute of limitations, because "to understand the parties' rights and obligations . . . one needs to rely on agreements and understandings other than those set forth in the written federal matrix" (emphasis added). In fact, these necessary written "agreements and understandings" reside largely in the Handbook and the Welcome Document, which explain CDW-G's basic commission policy and outline crucial details such as the timing of payments and the mechanics of gross profit calculation. As such, interpretation of the 2004 Powerpoint presentation necessitates reference to the Handbook; only when combined with the Handbook does that presentation form a complete policy. The 2004 presentation thus functions as a modification to the Handbook's terms rather than a free-standing contract offer. See Fitzgerald v. Southern Farm Agency, 94 S.E. 761, 762 (Va. 1918) (noting that a company's change to its broker's commission was "not a new contract, but a modification of the original agreement" (internal quotation omitted)).

8

Because the 2004 presentation only modified the terms of the Handbook, the Handbook -- as modified by the presentation -- continued to govern CDW-G's commission payments.  See Warren v. Goodrich, 112 S.E. 687, 694 (Va. 1922); Carnes Co. v. Stone Creek Mech., Inc., 412 F.3d 845, 853 (7th Cir. 2005).  And nothing in the 2004 presentation purported to alter the Handbook's disclaimers or the non-binding nature of CDW-G's projected commission rates.  The 2004 presentation therefore "did not amount to an offer to enter into a contract, but the announcement of a nonbinding intention."  Jensen, 454 F.3d at 390.  Although CDW-G's failure to make good on that professed intention may hamper its efforts to attract and motivate sales managers like Dodge, and may even give rise to a claim based on quantum meruit, see, e.g., Mongold v. Woods, 677 S.E.2d 288, 292 (Va. 2009), it does not constitute a breach of contract.

III.

For the foregoing reasons, the judgment of the district court is

REVERSED.

9