# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1309

_____

|  |  |  |
|---|---|---|
| Richard B. Brozo, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota |
| Oracle Corporation, | * | |
| a Delaware corporation, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 9, 2002

Filed: March 28, 2003

_____

Before McMILLIAN, LAY and RILEY, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Oracle Corporation (Oracle) appeals from a final judgment entered after a jury trial in the United States District Court for the District of Minnesota, awarding Richard B. Brozo damages in the amount of $604,249.00 on his breach of contract claim. Brozo v. Oracle Corp., No. 00-751 (D. Minn. Oct. 17, 2001) (judgment). For reversal, Oracle argues that the district court erred in holding that the contract at issue is ambiguous and, alternatively, erred in its instructions to the jury. For the reasons stated below, we reverse the judgment of the district court and remand the case to the district court for further proceedings consistent with this opinion.

Jurisdiction was proper in the district court based upon 28 U.S.C. § 1332. Jurisdiction is proper in this court based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

## Background

Oracle, a Delaware corporation with its principal place of business in Redwood Shores, California, develops, manufactures, markets, and distributes computer software and related products and services. In 1998, Oracle hired Brozo, a Minnesota resident, as a sales representative. Oracle informed Brozo that, in addition to his annual base salary of $91,800, he was entitled to receive commissions based in part upon his sales. The terms and conditions under which he was to earn salary, commissions, and bonuses were set forth in two documents entitled "Fiscal Year 1999 Oracle Americas Compensation Plan" and "License Sales Terms and Conditions" (together referred to as "the Plan"). Under the Plan, Brozo's commissions were to be calculated based upon a predetermined "annual quota," the number of "quota credits" he earned, and variable rates at which the commissions would be calculated. The Plan provides in relevant parts:

> A Compensation Plan ("the Plan") consists of (1) this document ("Compensation Plan Terms and Conditions") and (2) the individualized Compensation Plan. Acceptance of any commissions and/or bonuses payable under this Plan indicates acceptance of the Plan. This Plan covers the 1999 Fiscal Year from June 1, 1998 through May 31, 1999.
>
> Oracle agrees to:
>
> !      Pay compensation under the terms of the Compensation Plan.
>
> The employee agrees to:

! Accept as full compensation the compensation paid pursuant to the Compensation Plan.

* * * *

I. Definitions

* * * *

C. Commissions – Commissions may be earned based upon the attainment of quota and revenue goals.

* * * *

II. Administration

A. The Company shall make the final and binding determination of any amount payable under the Plan and reserves the right to change the Plan at any time, during or after the close of the fiscal year. Changes may be to salaries, bonuses, commissions, commission rates, quotas, territories or any other terms and conditions. Changes to the Plan are valid only if approved at the Vice President level or higher in accordance with Sales Planning practices. Entitlement to commissions and bonuses does not vest until the Company makes any and all final changes as authorized by the Plan.

B. For any single transaction that generates Quota Credit equal to or greater than the salesperson's annual quota, management at the Vice President level or higher will review the transaction and determine the appropriate treatment of the transaction under the Plan.

C. The Executive Vice President, Americas, or the Executive Vice President, Worldwide/US Services Management shall have the final responsibility, authority

and discretion in all matters of administration or interpretation of the Plan.

Addendum to Brief for Appellant at 18-19 (Defendant's Exhibit 101) (Fiscal Year 1999 Oracle Americas Compensation Plan, License Sales Terms and Conditions). It is undisputed that the Plan was a binding contract between Oracle and Brozo for the period of Brozo's employment.

Brozo was hired by Oracle in October 1998, four months into the 1999 fiscal year. At the time of his hire, Oracle was pursuing a sale of application software to Fingerhut Corporation (Fingerhut). Brozo was hired with the understanding that he would work on the Fingerhut deal, which he did. On May 31, 1999, Oracle and Fingerhut closed the deal, a multi-million dollar application software agreement. Brozo was initially given a "quota credit" for the Fingerhut transaction in excess of $10 million. That quota credit would have generated a commission of nearly $1 million. To address that matter, Oracle subsequently decided to cap Brozo's total quota credits for the 1999 fiscal year at 200% of his pro-rated annual quota, which in effect capped his commissions. Consequently, his commissions for fiscal year 1999 were approximately $600,000 less than they would have been with the $10 million-plus quota credit. Brozo resigned on November 29, 1999. His total compensation for the eight months of his employment in fiscal year 1999 totaled approximately $420,000 in salary and commissions.

Brozo brought the present action alleging breach of contract and related claims. In his complaint, Brozo claimed that Oracle owed him "substantial commissions," based upon the commission he allegedly earned, but was not fully paid, for the Fingerhut deal. Appellant's Appendix at 2-3 (complaint ¶¶ 5-10). Brozo also alleged in the complaint that, when his supervisor, Reed Olson, told him that his commission for the Fingerhut transaction was being capped, Olson gave the following reasons: "[he] had not been 'on board long enough' at Oracle; [he] allegedly had not 'worked

hard enough' on the final approval of the contract wording with Oracle's internal Legal and Revenue Recognition departments; and Oracle allegedly had the right to 'cap' a commission previously earned by a salesperson." Id. (¶ 8).

The parties filed cross-motions for summary judgment, asserting entitlement to judgment as a matter of law based upon terms of the Plan which they argued unambiguously supported their respective positions. The district court denied the parties' summary judgment motions. The district court explained: "the documents relied upon by the parties in support of their respective summary judgment motions are ambiguous; that is, they are susceptible of more than one meaning." Brozo v. Oracle Corp., No. 00-751 (July 26, 2001) (order).

At trial, Brozo presented evidence to show that, before he was hired by Oracle, he was a highly successful salesperson with over thirty years of experience; that he was specifically hired to work on the Fingerhut deal; and that he became the "lead person" on the Fingerhut transaction, which required of him hundreds of hours over a period of many months. Brief for Appellee at 7-8. He earned a $10 million-plus quota credit for the Fingerhut deal and accordingly earned a commission of approximately $1 million under the terms of the Plan. However, after the Fingerhut transaction closed, a personal conflict arose between him and Olson. According to Brozo, he had played a practical joke on Olson while they were on a fishing trip, which caused Olson some embarrassment. Phil Ward, another Oracle salesperson who had been involved in the practical joke, testified that Olson said that he was going to teach Brozo a lesson by reducing Brozo's commission on the Fingerhut deal. A few days after the fishing trip, Olson sent an e-mail message to his supervisor, Mike Rosser, in which he recommended that Brozo's commission for the Fingerhut deal be reduced. Thereafter, Oracle made a retroactive "manual" adjustment and reduced Brozo's earned commissions by $604,249 for fiscal year 1999.

Oracle introduced evidence to show that Brozo did not do as much work on the Fingerhut transaction as he claimed. Because the Fingerhut deal was a single transaction that clearly had generated a quota credit greater than Brozo's annual quota, Senior Vice President Mary Anne Gillespie "flagged" it as requiring review. Based on her observations of Brozo's contribution and on recommendations she received from Brozo's supervisors, Gillespie decided that the appropriate treatment was to cap Brozo's total quota credits for fiscal year 1999 at 200% of his pro-rated annual quota, thereby still allowing him to earn almost $420,000 for his eight months of employment with Oracle during fiscal year 1999.

Prior to the submission of the case to the jury, Oracle requested that the district court include the following jury instructions: (1) "[w]hether or not commissions have in fact been 'earned' depends upon the particular, unique requirements of the employer's policy"; and (2) "[w]here a contract provides that an employer retains discretion to determine amounts payable under a compensation plan, that term is valid and enforceable." The district court declined to submit these proposed instructions to the jury. The jury returned a special verdict finding that Oracle had committed a breach of contract resulting in damages to Brozo in the amount of $604,249.00.

Oracle moved for judgment as a matter of law or, in the alternative, a new trial. In support of its motion for judgment as a matter of law, Oracle again maintained that the Plan unambiguously gave Oracle the discretion to implement a cap on Brozo's commissions for fiscal year 1999. Oracle further argued that, under Vigoro Indus., Inc. v. Crisp, 82 F.3d 785, 791 (8th Cir. 1996) (Vigoro), this discretionary business decision was beyond judicial review. Brozo moved for prejudgment interest, a statutory penalty, attorneys' fees and costs. The district court held a hearing on the pending motions on November 16, 2001. Thereafter, the district court entered a memorandum, opinion, and order denying Oracle's motion for judgment as a matter of law or for a new trial and granting Brozo's request for prejudgment interest, a

statutory penalty, attorneys' fees, and costs. <u>Brozo v. Oracle Corp.</u>, No. 00-751 (Dec. 28, 2001) (memorandum opinion and order) (hereinafter "slip op.").

In denying Oracle's motion for judgment as a matter of law, the district court first rejected Oracle's renewed argument that the Plan unambiguously granted Oracle the discretion to review and revise Brozo's commissions.

The district court reasoned:

> The applicable language is ambiguous; it does not give to [Oracle] unfettered discretion to deduct or limit amounts otherwise payable under Oracle's incentive compensation plan. Oracle points to language giving it the "right to change the Plan at any time," (Sec. II A., Terms and Conditions), and the right to "determine the appropriate treatment of the transaction under the Plan." (Individualized Compensation Plan, Passage B.) In isolation, these words/phrases may appear unambiguous, but in the context of the Individualized Compensation Plan and the Terms and Conditions, the urged interpretation simply makes no sense. Without regard to the trial testimony (which clearly contradicted Oracle's interpretation), Oracle's construction would convert what is clearly an employment contract into nothing more than a "we'll pay you whatever we want" and "we'll let you know our decision whenever we want – even at the end of the fiscal year when you – the employee – have performed up to expectations" arrangement.

<u>Id.</u> at 2.

The district court further rejected Oracle's argument based on <u>Vigoro</u>, commenting that Oracle "seem[ed] to be now guided (really misguided) by the language [in <u>Vigoro</u>] . . . 'When a contract term leaves a decision to the discretion of one party, that decision is virtually unreviewable.'" <u>Id.</u> at 3. The district court continued:

The present case is not, however, one in which the contract terms leave to the "discretion of one party" the how, when and under what circumstances to pay an employee for performance. In <u>Vigoro</u>, the incentive compensation plan permitted the employer to "deduct 'amounts Management deems appropriate as a penalty for mismanagement . . . .'" In exercising its rights under this provision, management "decided that [the employee] deserved no incentive bonus in a year in which <u>he breached his duty of loyalty by soliciting employees and customers to join him in a competing venture</u>." That type of employee misconduct will be penalized almost anywhere. Clearly the facts of <u>Vigoro</u> render the holding there inapplicable here. The documents here have no standards to be employed and are not limited to misconduct such as occurred in <u>Vigoro</u>.

<u>Id.</u> at 3 (emphasis original) (internal citations omitted).

Following the district court's entry of final judgment in favor of Brozo, Oracle appealed.

**Discussion**

Oracle argues that the district court erred in holding that the Plan is ambiguous. We review *de novo* the question of whether or not contract language is ambiguous. <u>See, e.g.,</u> <u>Barry v. Barry</u>, 78 F.3d 375, 382 (8th Cir. 1996). A contract is ambiguous if it is reasonably susceptible to more than one interpretation, considering the context in which the words are used and giving them their plain and ordinary meaning. <u>See id.</u> At this stage, we must decide whether or not the Plan is ambiguous without considering extrinsic evidence, the jury's decision, or our own views of how the contract could have been written or performed more fairly. <u>See, e.g.,</u> <u>Federal Deposit Insur. Corp. v. Hartford Accid. & Indem. Co.</u>, 97 F.3d 1148, 1151 (8th Cir. 1996) ("A court must not impose its own concept of fairness under the guise of construing a contract.").

Brozo argues that the lack of specificity in the Plan as to when a commission is earned and whether the Plan allows for capping commissions renders the Plan ambiguous. For example, Brozo argues, the phrase "appropriate treatment of the transaction under the Plan" in Part II.B. of the Plan is never defined and, therefore, it is unclear whether capping a commission can be such appropriate treatment – especially when the Plan *expressly* allows capping of a "Milestone Bonus." As to the reference to a company vice president's authority to review a single transaction for which the quota credits exceed the salesperson's annual quota, Brozo argues that this does not unambiguously give the officer the authority to change the amount of the commission but, rather, could also simply mean that the vice president may "review[] an earned commission to ensure that all the I's are dotted and T's are crossed before the commission is paid." Brief for Appellee at 29. Brozo also contends that the Plan interpretation urged by Oracle is draconian, would render almost the entire agreement superfluous, and simply does not make sense. Under well-established rules of contract interpretation, Brozo continues, a contract will not be read so as to lead to a harsh or absurd result. Brozo also emphasizes that Oracle asked him to sign an amended version of the Plan for fiscal year 1999 which would have expressly capped his commissions at 200% of his annual goal. Then, in fiscal year 2000, Oracle amended the Plan documents to cap every salesperson's total annual commissions at 200% of his or her annual goal. Neither of these actions would have been necessary, Brozo suggests, if the language in the original Plan did indeed clearly and unambiguously give Oracle the right to retroactively impose such a cap on any salesperson's commissions at any time prior to payment.

There is no dispute that the Plan represents an arms-length agreement between Oracle and Brozo regarding the terms and conditions by which Brozo's incentive compensation would be determined. As noted above, Part II.A. of the Plan sets forth the following language:

The Company shall make the final and binding determination of any amount payable under the Plan and reserves the right to change the Plan at any time, during or after the close of the fiscal year. Changes may be to salaries, bonuses, commissions, commission rates, quotas, territories or any other terms and conditions. Changes to the Plan are valid only if approved at the Vice President level or higher in accordance with Sales Planning practices. Entitlement to commissions and bonuses does not vest until the Company makes any and all final changes as authorized by the Plan.

Addendum to Brief for Appellant at 19 (Defendant's Exhibit 101) (Fiscal Year 1999 Oracle Americas Compensation Plan, License Sales Terms and Conditions).

Part II.B. of the Plan adds:

For any single transaction that generates Quota Credit equal to or greater than the salesperson's annual quota, management at the Vice President level or higher will review the transaction and determine the appropriate treatment of the transaction under the Plan.

<u>Id.</u>

At the hearing on the parties' post-trial motions, the district court indicated its view that the phrase "appropriate treatment" in Part II.B. in the Plan was ambiguous. <u>See</u> Appellant's Appendix at 35 (Transcript of hearing on Nov. 16, 2001) (referring to the phrase "appropriate treatment," the district court stated: "I don't know what that means. I really don't. To me it could mean a lot of things. . . . I don't read that to say you can then, basically after the fact, do anything you want with a commission. And as long as you are doing it for some 'business reason' or at least not fraudulently . . . that it's okay."). In the written order that followed, the district court reasoned that, while it might appear that this and other language in the Plan unambiguously permitted Oracle to make the challenged adjustment to Brozo's commissions, that interpretation "makes no sense" in the context of the overall contract because it

-10-

"would convert what is clearly an employment contract into nothing more than a 'we'll pay you whatever we want' and 'we'll let you know our decision whenever we want to–even at the end of the fiscal year when you–the employee–have performed up to expectations' arrangement." Slip op. at 2. We disagree.

In the present case, the Plan unambiguously delegated to Oracle, acting through its officers at the vice president level and higher, the discretionary authority to decide upon "appropriate treatment . . . under the Plan" whenever a single transaction generated for Brozo a quota credit equal to or greater than his annual quota. Therefore, the need for a precise definition of words "appropriate treatment . . . under the Plan" was plainly obviated by the fact that the determination of what that might be was left to Oracle's sole discretion. The Plan need not (nor could not) specify every possible form of "appropriate treatment" for every qualifying situation. Moreover, the delegation of discretionary authority is no less clear because the Plan expressly mentions some, but not all, possible forms of appropriate treatment (e.g., a cap on bonus) or because Oracle subsequently attempted to add an express cap on commissions to the Plan.

"When a contract term leaves a decision to the discretion of one party, that decision is virtually unreviewable. *At most*, courts will step in 'when the party who would assume the role of sole arbiter is charged with fraud, bad faith, or a grossly mistaken exercise of judgment.'" Vigoro, 82 F.3d at 785 (emphasis added) (citing Amant v. Kidde, Inc., 756 F.2d 685, 868 (8th Cir. 1985) (per curiam), and quoting Golden v. Kentile Floors, Inc., 512 F.2d 838, 847 (5th Cir. 1975)). Under our precedents, therefore, the district court was constrained from intervening in Oracle's business decision absent sufficient evidence of fraud, bad faith, or gross mistake of judgment. This is not to suggest that Oracle had a completely unfettered right to pay Brozo whatever it wanted, whenever it wanted, regardless of Brozo's performance; it is to say, however, that, although Oracle's decision might have been unfair, it may nevertheless be out of our reach. Moreover, while it is clear that the facts in the

-11-

present case are different from the facts in Vigoro – because, for example, the plaintiff in Vigoro had engaged in employee disloyalty – such factual differences do not diminish the applicability of Vigoro's rule generally precluding judicial review of a discretionary business decision made pursuant to an unambiguous contractual delegation of discretionary decision-making authority. Rather, such factual considerations weigh into the analysis of whether or not the business decision involved bad faith, fraud, or a gross mistake of judgment. See Vigoro, 82 F.3d 785 ("In this case, Vigoro's management decided that Crisp deserved no incentive bonus in a year in which he breached his duty of loyalty . . . . This cannot be called a bad faith or grossly mistaken exercise of judgment.").

In the district court, in response to Oracle's motion for judgment as a matter of law, Brozo distinguished the present case from Vigoro and argued that Vigoro therefore does not apply. Brozo did *not* argue, however, that Oracle had engaged in fraud, bad faith, or a grossly mistaken exercise of judgment within the meaning of Vigoro. Brozo argues for the first time on appeal that Oracle's actions amounted to a fraud, bad faith, or a gross mistake of judgment. He argues:

> Oracle claims that under the Vigoro standard, Brozo cannot show that it acted fraudulently, in bad faith, or committed any gross[ly mistaken] exercise in judgment. Oracle's argument conveniently ignores evidence presented at trial suggesting otherwise, including the fact that Reed Olson recommended that Brozo's commission be capped to "punish" him and "teach him a lesson" or that Brozo was the only [sales representative] at Oracle to be "capped."

Brief for Appellee at 38 n.10.

"We consider a newly raised argument only if it is purely legal and requires no additional factual development, or if a manifest injustice would otherwise result." Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 725 (8th Cir. 2002). Brozo's argument is not a purely legal one because it requires a factual finding that Oracle did engage

in fraud, bad faith, or a grossly mistaken exercise of judgment. Moreover, no manifest injustice would result from our treating it as waived because Brozo's only viable argument is that Oracle acted in bad faith, and Minnesota does not recognize an implied duty of good faith and fair dealing in employment contracts. See Hunt v. IBM Mid. Am. Employees Fed. Credit Union, 384 N.W. 2d 853, 858 (Minn. 1986) ("[W]e have not read an implied covenant of good faith and fair dealing into employment contracts."); Singleton v. Christ the Servant Evangelical Lutheran Church, 541 N.W.2d 606, 613 (Minn. Ct. App.) ("Minnesota law . . . does not recognize implied covenants of good faith and fair dealing in employment contracts."), cert. denied, 519 U.S. 870 (1996).

In sum, we hold that the Plan unambigiously gave Oracle the discretion to reduce Brozo's commissions for fiscal year 1999 and that, under Vigoro, judicial review of Oracle's discretionary decision is not warranted. The district court erred in denying Oracle's motion for judgment as a matter of law.

## Conclusion

For the reasons stated, we reverse the district court's denial of Oracle's motion for judgment as a matter of law. We vacate the jury's verdict and remand the case to the district court for further proceedings consistent with this opinion.[1]

LAY, Circuit Judge, dissenting.

I dissent to point out the blatant error in the majority's interpretation of the contract. The test of whether a contract is ambiguous, thus allowing extrinsic evidence to be admitted before a jury as the trial court did here, or whether the

---

[1]Accordingly, we do not consider Oracle's challenge to the district court's jury instructions.

-13-

contract is unambiguous as the majority finds, turns on whether reasonable minds might differ as to the meaning of the terms of the contract. In the present case, the district court was privy to all of the evidence and heard the arguments of both sides whether the contract was ambiguous. To urge that the district court acted unreasonably ignores the express language of the entire contract as well as the district court's comments and findings. In interpreting the contract, the majority has substituted a twisted version of what the contract means without considering the plain wording embodied within the contract. Although the majority gives lip service to the fact that the contract expressly provides that only bonuses may be capped, it gives little meaning to this significant language. There is no language in the contract that says a commission, after it has been earned, may be capped. The fact that the contract provides only for bonuses to be capped and not commissions is given little or no weight by the majority. This in itself is significant error. The majority has found a way to cap Brozo's commission by taking language in the contract completely out of context.

There are other legal concerns surrounding the construction of the contract by the majority. First, the majority failed to take into consideration all of the facts and circumstances, including the conduct of the parties, surrounding the contract and the reliance that the parties have placed upon it. See Restatement Second of Contracts § 202; see also 11 Richard A. Lord, Williston on Contracts § 32:2, at 402 (4th ed. 2000). Second, the majority has failed to give a coherent and consistent meaning to all terms in the contract. See Lord, supra, at § 32:3, at 408. Third, the majority overlooks that the ultimate interpretation of the contract should be reasonable and not arbitrary or capricious and should reflect a just result. See id. at § 32:11 (stating "interpretations which render the contract fair and reasonable are preferred to those which render the contract harsh or unreasonable to one party"). In the present case, the majority has ignored these principles. The majority's opinion states that an employer can change an employee's compensation after the employee's work is completed and the compensation is earned. I challenge the majority to find any

contract that has ever been interpreted in such a nonsensical way. As the district court observed, Oracle's interpretation of the contract now adopted by the majority makes "no sense." Even if we assume the contract is not ambiguous, the majority overlooks that when Brozo was hired, he was presented a copy of a Standard Individual Compensation Plan which reflected a cap on bonuses but not on commissions. The majority ignores the terms of compensation within the contract as to when an employee earns a commission; the contract provides that Brozo's compensation expressly depended upon the credits that were earned and there is a specific provision of the contract that states the credits are earned upon "booking" or "revenue recognition." The majority overlooks Section IV of the contract which provides that certain revenues, such as license revenues, would be earned 100 percent upon "revenue recognition" and when this occurred, Oracle's revenue recognition department "recognized" the revenue as a guaranteed receivable. The contract provides in terms, completely ignored by the majority, that other credits for education, renewals, or consulting were earned 100 percent upon "booking of the sale." Notwithstanding this express language, the majority approves the capping of Brozo's commission after the sale, even though the commission had already been earned. Thus, the majority ignores the express language of the contract and fashions a result which completely contradicts the express terms of the contract.

The majority relies upon language of paragraphs A and B of Section II of the contract which provides as follows:

> A.    The Company shall make the final and binding determination of any amount payable under the Plan and reserves the right to change the Plan at any time, during or after the close of the fiscal year. Changes may be to salaries, bonuses, commissions, commission rates, quotas, territories or any other terms and conditions. Changes to the Plan are valid only if approved at the Vice President level or higher in accordance with Sales Planning practices. Entitlement to commissions and bonuses does not vest

-15-

until the Company makes any and all final changes as authorized by the Plan.

B.    For any single transaction that generates Quota Credit equal to or greater than the salesperson's annual quota, management at the Vice President level or higher will <u>review the transaction and determine the appropriate treatment of the transaction under the Plan</u>.

Add. 19 (emphasis added).

By singling out one sentence in the above contract, the majority contradicts the other express terms of the contract which guarantee a commission once earned. In doing so, the majority slights the principle that the meaning of words in a contract depends upon the words around it. Lord, <u>supra</u>, at § 32:6, at 432-34; <u>see</u> <u>also</u> <u>Jarecki v. G.D. Searle & Co.</u>, 367 U.S. 303, 307 (1961) (stating a contract term is "known by the company it keeps"). Oracle uses this language, as does the majority, to mean that a commission can be retroactively capped notwithstanding the simplicity of the contract which says only bonuses can be capped,[2] and that the commission is deemed earned upon the sale.

The extrinsic evidence heard by the jury demonstrates the absurdity of the majority's interpretation of the contract. In June of 1999, prior to Oracle's unauthorized capping of the commission, Oracle attempted to amend the Individual Compensation Plan and submitted it to Brozo for his signature capping his commission at 200 percent. Brozo refused to sign the amended Plan. Oracle officials

---

[2]The jury heard testimony that Brozo's supervisor, Reed Olson, decided to punish Brozo and reduce his commission on the Finger Hut deal because Brozo had played a practical joke on him on a fishing trip. Thus, Brozo's earned commission of $630,000 was capped at $183,589.

conceded that the employee's signature to amend the Plan was required for a retroactive adjustment.[3]

I respectfully submit that the learned district court accurately refuted Oracle's argument by the following statement:

> [Oracle's] construction [of the Plan] would convert what is clearly an employment contract into nothing more than a "we'll pay you whatever we want" and "we'll let you know our decision whenever we want to–even at the end of the fiscal year when you–the employee–have performed up to expectations" arrangement.

Add. 2.

One of the cardinal principles of contract construction is that every contract should be interpreted to provide a lawful and legal meaning. Lord, supra, at § 32:11, at 453. If Oracle is correct in its argument, which the majority has sanctioned, they have turned this agreement into an illusory contract meaning that there is no contract at all. In other words, if Brozo is committed to a performance Plan, to say that his employer may act within its sole discretion to do whatever it wants to do, renders the contract illusory. See Family Snacks of North Carolina, Inc. v. Prepared Products Co., Inc., 295 F.3d 864, 867-68 (8th Cir. 2002) (restating the common law contract principle that both parties must be obligated to perform under a contract); Heuser v. Kephart, 215 F.3d 1186, 1191 (10th Cir. 2000) (holding a contract illusory because

---

[3]The majority overlooks Minnesota law which controls an interpretation of the contract. Under Minnesota law, the legislature has provided: "When an employer employing labor within this state discharges an employee, the wages or commissions actually earned and unpaid at the time of the discharge are immediately due and payable upon the demand of the employee." Minn. Stat. § 181.13. To urge as the majority does, that the contract between Brozo and Oracle provides Oracle the discretion to retroactively reduce the compensation, borders upon the ridiculous.

city officials had unfettered discretion to accept or reject a settlement offer); <u>Gray v. American Express Co.</u>, 743 F.2d 10, 19 (D.C. Cir. 1984) (holding that a contract between a credit card company and card holder did not allow the credit card company to revoke the credit card after charges had already accrued because such a contract would be illusory); 3 Lord, <u>supra</u>, at § 7:7, at 88-89 (stating a promise which allows one party to escape performance of anything detrimental to himself or beneficial to the promisee is illusory).

Another reasonable interpretation of Section II which Oracle relies upon demonstrates that it is susceptible to other meanings. The majority overlooked the fact that Section II, which says changes may be made to commissions, etc., is predicated upon Oracle's power and right to <u>change the Plan</u>. There is nothing within the plain meaning of Section II.A which gives the employer the right to retroactively alter a single earned commission.[4] Oracle changed the Plan for fiscal year 2000, specifically capping salespersons' quotas at 200 percent. Oracle, however, did nothing to "change the Plan" prior to its attempt to retroactively cap Brozo's commissions. None of the documents were amended or altered. Instead, Oracle simply attempted to change a single commission on a retroactive basis. Clearly the contract does not provide for such unilateral conduct. As Brozo points out, such an interpretation would render every other part of the Plan meaningless.

The majority also overlooks another basic standard governing the construction of a contract: the court must construe the agreement against the drafter. 11 Lord, <u>supra</u>, at § 32:12, at 472. Oracle respectfully submitted the majority's twisted version of the contract complied with the general principle of contract interpretation, as well as the evidence of the record. A contract should not be construed so strictly as to lead

---

[4]This contract had never been interpreted by Oracle in the manner that the majority asserts at any time during its existence.

to a harsh or absurd result. Employers Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn., 282 Minn. 477, 479-80, 165 N.W.2d 554, 556 (1969).

It is also clear that the conduct of the parties contradicted Oracle's interpretation of the Plan. As the district court pointed out, if Oracle so clearly had the right to "cap" Brozo's earned commission, they never would have prepared a new agreement for Brozo to sign to add capping language to the Plan for fiscal year 2000.[5] In the present case, the Plan provides that commissions are earned "upon booking" or "upon revenue recognition." I set forth this proviso at the beginning of this dissent. These terms are completely ignored by the majority. In addition, the majority ignores Section II of the contract which states that Oracle <u>must</u> act "as <u>authorized</u> by the Plan" and determine appropriate treatment "under the Plan." Add. 19 (emphasis added).

I strongly endorse the district court's reasonable interpretation of the contract where it correctly noted "[t]he present case is not . . . one in which the contract terms leave to the 'discretion of one party' the how, when and under what circumstances to pay an employee for performance." Add. 3.

In conclusion, I once again assert that there is no reported case of which I am aware that provides an employer has unrestricted discretion to retroactively change a commission once earned when there is no express provision in the contract providing for it. Any employee would be a fool to enter into such a contract. This

---

[5]The majority relies upon the case of Vigoro Indus., Inc. v. Crisp, 82 F.3d 785 (8th Cir. 1996). In doing so, it takes language out of context in holding that Vigoro stands for the proposition that "[w]hen a contract term leaves a decision to the discretion of one party, that decision is virtually unreviewable." Vigoro, 82 F.3d at 791. Vigoro, of course, is clearly distinguishable. The employee's bonus could be reduced by the expressive terms of the contract if management deemed it "appropriate as a penalty for mismanagement." Id.

not only points out a total absence of reasonableness in the majority's interpretation, but also singles out how unjust and nonsensical its interpretation appears to be.

This case troubles me as much as any case that I have sat on in over thirty-seven years on this court. In the present case, the law is clear. There can be little doubt that the district court exercised a reasonable interpretation to the contract and correctly submitted the case to the jury. In writing this dissent, I recognize that it is a strong one; however, as I have indicated, to deny a party a commission properly earned under the express terms of a contract in the manner the majority has attempted to do in this case, requires strong words and a strong objection. I accordingly strongly dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.