NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0119n.06

No. 14-3356

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Feb 10, 2015*
DEBORAH S. HUNT, Clerk

EMILY BAHR,

      Plaintiff-Appellant,

v.

TECHNICAL CONSUMER
PRODUCTS, INC.,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

BEFORE:    DAUGHTREY, MOORE, and CLAY, Circuit Judges.

**CLAY, Circuit Judge.**  Plaintiff Emily Bahr appeals the district court's grant of summary judgment in favor of Defendant Technical Consumer Products, Inc. ("TCP"), dismissing Bahr's claim for contract damages based on disputed bonus compensation, in this action before us pursuant to diversity jurisdiction under 28 U.S.C. § 1332. We **REVERSE** the judgment of the district court for the reasons stated below and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

**I.    Procedural History**

Bahr filed her breach of contract claim in the Portage County, Ohio, Court of Common Pleas on April 5, 2013.[1] On May, 9, 2013, TCP removed the case to the United States District

---

[1] Bahr also asserted claims for damages under the alternative theories of promissory estoppel and unjust enrichment. She also appeals the district court's grant of summary judgment

Court for the Northern District of Ohio, on the basis of diversity jurisdiction. Bahr's complaint included six counts: 1) Breach of Express Bilateral Contract; 2) Breach of Express Unilateral Contract; 3) Failure to Remit Wages; Chapter 181 of the Minnesota Statutes; 4) Failure to Remit Wages; Ohio Prompt Pay Act – Ohio Rev. Code § 4113.5; 5) Promissory Estoppel; and 6) Unjust Enrichment.

On July 8, 2013, the court raised the issue of jurisdiction because the amount in controversy was dependent on the choice of law. The underlying claim is for $51,716, less than the $75,000 jurisdictional threshold required by § 1332, but Bahr could potentially recover double that amount due to civil penalties that might attach if the claim was resolved under Minnesota law. On December 2, 2013, the district court held that Minnesota law was the correct choice of law, and thus, diversity jurisdiction was established.

While the court addressed the jurisdictional issue, the parties conducted discovery in advance of a December 16, 2013, dispositive motion filing deadline. On December 10, 2013, Bahr filed a motion to amend the complaint. Both Bahr and TCP filed motions for summary judgment on December 16, 2013. Bahr's motion sought summary judgment on count two, breach of express unilateral contract, and count three, failure to remit wages. TCP's motion applied to all counts. On March 17, 2014, the district court denied both of Bahr's motions, and dismissed the complaint after granting TCP's motion for summary judgment in its entirety.

---

with respect to these claims, as well as the district court's denial of her motion for leave to amend her complaint.

## II.      Factual Background

### A.      Hiring Process and Pre-Employment Negotiations

In April of 2010, Bahr responded to a job posting for the position of District Sales Manager, listed on Monster.com. Bahr, a resident of Minnesota, was at that time working for Outset, Inc. as a Product Support Specialist. Her resume and cover letter were forwarded to TCP, a manufacturer and distributor of energy-efficient lighting products, headquartered in Ohio.

Shortly thereafter, the Human Resources Department at TCP headquarters contacted Bahr to set up a screening interview over the telephone. Bahr discussed her previous work history and was given a description of the job responsibilities during that interview. The position would entail the management of all sales for the Commercial & Industrial Division of TCP ("C&I") within the states of Minnesota, North Dakota, and South Dakota. No compensation plans were discussed during this phone interview.

Bahr thereafter was invited to meet in person with both the TCP Regional Sales Manager and the TCP Senior Vice President of Sales, Mike Masino. Masino explained during this interview that the District Sales Manager position was new to TCP. The Company was moving away from its reliance on independent contractors in an attempt to boost sales. Masino had been hired the previous year with the expectation that he would triple sales volume within C&I, while continuing to improve the profit margin on such sales. Masino later designed the bonus plan at issue in this case with these goals in mind. However, neither this nor any other bonus plan were discussed during Bahr's second interview. The same was true for her third and final interview.

On Wednesday, June 9, 2010, TCP offered Bahr the position. The base salary was $42,500. The offer made no mention of any bonus compensation. Bahr's time at Outset, Inc., however, led her to believe that a commission or bonus plan was a standard part of compensation for this type of sales position.

On Thursday, one day after receiving the offer, Bahr emailed the Regional Sales Manager to seek additional information regarding her potential employment. Specifically, Bahr wanted the "past/current territory sales targets" data and the details of any bonus or commission-based "sales incentive plan." (R. 45-5, Bahr-Fejedelem Emails, PageID # 1334). The District Sales Manager, the following Wednesday, provided a "[r]ough example" of how the contemplated bonus plan would potentially be set up. (*Id.* at 1337). He followed up by forwarding an email from Senior Vice President of Sales Mike Masino that included the details of a plan that was actually under consideration. The email stated in all capital letters that the plan had "NOT BEEN OFFICIALLY APPROVED," but Masino noted that he anticipated its approval by July. (R. 45-6, Masino-Fejedelem Email, PageID # 1339). Bahr accepted the offer shortly thereafter. These emails were the extent of Bahr's pre-employment communications regarding any bonus structure.

**B.      2011 Bonus Plan**

Bahr's employment with TCP began on June 23, 2010. No bonus plan was approved in 2010. Bahr's expectation was that the plan was forthcoming. She asked about the plan described during the email exchange prior to her employment, but decided not to press the issue as she was still new to the company.

On July 1, 2011, C&I Director of Sales Ryan Miller announced the "C&I Sales Bonus Plan" for the District Sales Managers. The plan's terms and conditions stated:

> You can earn up to 200% of Base Salary if certain objectives are achieved. All payouts will be paid no later than 45 days following the bonus period end. Unless noted otherwise, all bonus plans are on an annualized basis and based on a calendar year. All computations and allocations will be established by the Company and be arbitrated solely by the Company.

(R. 45-10, 2011 Bonus Plan, PageID # 1146) (emphasis in original). The plan included a matrix that detailed the possible payouts. Above this matrix was the following caption in bold: "The payout schedule below details the percentage of base salary that will be paid for meeting performance objectives." (*Id.* at 1147) Pursuant to this plan, a District Sales Manager who achieved 100% year-over-year sales growth and a 42% gross margin for their specific territory would earn the highest payout, 200% of their base salary.

The plan also included two provisions that could modify the payouts as stated in the schedule. A section entitled "Plan Subject to Change" read:

> Management reserves the right to amend, change, or cancel the Bonus Plan at its discretion. It also reserves the right to reduce, modify or withhold awards based upon individual performance or management modification.

(*Id.*) The other provision addressed "Windfall and Shortfall Situations." (*Id.*) It stated:

> Any windfall or shortfall situations that have a significant impact on sales or other measurement criteria will be dealt with on an individual basis by management. Adjustments to these measures can be made throughout the year at the discretion of the Company, and upon written communication to the participant. The discretion of management is final.

(*Id.*) These provisions were part of the form terms and conditions that were used in all TCP bonus plans.

In July 2011, when the plan was adopted, management was aware that Bahr's sales figures were tracking towards the maximum bonus payout. In September of that year, Miller confirmed that TCP intended to pay out bonuses according to the schedule. Throughout the fall, the Regional Sales Manager encouraged Bahr to hit her numbers so that she could max out her potential bonus. However, September was the last time that Bahr specifically asked whether the payout schedule, as presented on July 1, would be honored.

### C.    2011 Bonus Payout

On December 21, 2011, CFO Valerie Campbell sent a letter to all TCP employees, informing them that the "ability . . . to pay bonuses will not be determined until the books are completely closed for the year which would be sometime in January." (R. 45-11, Bonus Ltr., PageID # 1448.)  The letter also stated that bonus-eligible employees would receive a holiday bonus in the meantime.  For employees like Bahr, on a "defined bonus plan," "this [holiday] bonus amount [would] be considered an advance on [their] official bonus." (*Id.*)

On January 15, 2012, Campbell informed Masino and Miller that she had reviewed the C&I bonus numbers and discovered that TCP could not afford to pay them.  She noted that these were the last financials to be closed out and paying anything more than $285,000 would cause TCP to default on its bank covenants, specifically the fixed charge coverage ratio.  Campbell acknowledged "that $285,000 is an amount considerably less than the original bonus estimate," but she believed that TCP could "still pay out good bonuses to everyone deserving of them and give support as to why the amount is what it is." (R. 41-1, Ex. E, PageID # 370).  Campbell specifically identified the District Sales Managers' bonus plan as a significant problem.  [*Id.*] She informed Masino and Miller that the books would be closed the following day and it was their job to figure out how to divvy up the $285,000.  She concluded her letter by stating that "C&I was a savior this year . . . but unfortunately the overall company performance just does not allow for the payouts at the levels on the estimated file." (*Id.* at 373).  Notably, Campbell had approved the bonus plan in question—the source of the estimated liability—only seven months earlier.

Bahr's final sales results for 2011 were 113% year-over-year sales growth and 42% gross margins, placing her in the highest category for bonus pay-outs based under the plan.  She finished first among all C&I District Sales Managers.  Thus, she anticipated that her bonus

would be $85,945, which represented 200% of her base salary—the percentage listed on the matrix that corresponded with her sales numbers.

On February 3, 2012, Bahr received an email from Miller stating that bonus payouts were "constrained by overall company profitability" and that she would only be paid $34,229, representing 80% of her base salary or $51,716 less than she anticipated receiving. Bahr sought clarification regarding the discrepancy but was repeatedly told that the payout was due to company performance and was not a reflection of her efforts.

Management was aware that she was upset and approached Bahr on a few occasions to discuss how she might find new opportunities and grow within the company. Bahr continued working for TCP and received excellent reviews that spring despite her disappointment. In the fall, she resigned from TCP after securing employment with another company. She noted her disappointment with the 2011 bonus payout and a desire to work for a "more honest" company as her reasons for leaving. She also mentioned that the new position gave her a better opportunity for career advancement and a higher salary.

Bahr never received the additional compensation that she believed due and brought this suit to recover under the alternative theories of breach of unilateral contract; breach of bilateral contract; unjust enrichment; and promissory estoppel.

## DISCUSSION

### I.    Unilateral Contract Claim

To prove breach of a unilateral contract Bahr must first show that: 1) TCP made a definite offer, which was communicated to her;  2) Bahr accepted that offer;  and 3) there was valid consideration. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn. 1983). The district court determined that the Bonus Plan did not constitute a definite offer because TCP

retained sole discretion over whether to award a bonus; or in the alternative, if it was an offer TCP's decision to award a reduced bonus was within its discretion reserved under the plan. *See Bahr v. Tech. Consumer Prods.*, No. 5:13CV1057, 2014 WL 1094426, *9–10 (N.D. Ohio March 17, 2014) ("Ultimately, Bahr cannot get past the discretionary nature of TCP's bonus plan.").

We review *de novo* the disposition of a summary judgment motion. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004). Summary judgment shall be granted when there exists no genuine dispute of material fact and, in light of the facts presented, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Bahr was entitled to summary judgment on count two of her complaint because the Bonus Plan was an offer for a unilateral contract, and TCP's failure to exercise its discretion retained thereunder prior to Bahr's full performance meant that TCP was obligated to satisfy the terms of its offer or be in breach of the fully formed contract.

On appeal, TCP argues: 1) the promise was indefinite; 2) there was no consideration; and 3) that even if there was a unilateral contract, the reduction of Bahr's bonus was a valid exercise of its reserved discretion. TCP also argues, in the alternative, that Bahr waived any right to the balance of her claimed bonus by remaining employed with TCP for nine months after it failed to pay her. We address each of these arguments in turn. Sitting in diversity, we apply the law of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Hayes v. Equitable Energy Resources Co.*, 266 F.3d 560, 566 (6th Cir. 2001). Ohio looks to the Restatement (Second) of Conflict of Laws to determine the choice of law where that decision has not been agreed upon by contract. *Tele-Save Merch. Co. v. Consumers Distrib. Co.*, 814 F.2d 1120, 1122 (6th Cir. 1987). We apply Minnesota law because the state has the "most significant

relationship to the transaction and the parties." *See* Restatement (Second) of Conflict of Laws § 188.

## A.    The July 1 Bonus Plan Constitutes a Definite Offer

A promise must be "sufficiently definite" to constitute an offer to enter a legally binding contract. *Hartung v. Billmeier*, 66 N.W.2d 784, 787 (Minn. 1954). Whether a sufficiently definite offer exists (as opposed to a mere proposal) is an objective consideration "determined by the outward manifestations of the parties." *Pine River State Bank*, 333 N.W.2d at 626. For example, the Minnesota Supreme Court in *Hartung* held that the oral statement "[y]ou boys stick with me for five years and I will give you a hundred dollars a year bonus" was sufficiently definite to form a binding unilateral contract when an employee accepted the offer by working for his employer for the next five years. 66 N.W.2d at 786, 789. Whether an offer is sufficiently definite is a question of law to be answered by the courts. *Chambers v. Travelers Cos.*, 764 F. Supp. 2d 1071, 1078 (D. Minn. 2011).

Employee handbooks with definite policies may constitute an offer for a unilateral contract under Minnesota law. *See, e.g.*, *Pine River State Bank*, 333 N.W.2d at 627; *Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 707 (Minn. 1992); *Chambers v. Metro. Prop. Cas. Ins. Co.*, 351 F.3d 848, 853 (8th Cir. 2003). The offers made in an employee handbook must satisfy the general principles of unilateral contract formation, but no more is required. *Feges*, 483 N.W.2d at 707. A bonus plan not contained within the employee handbook may likewise form the basis of an enforceable contract. *See Bley v. Clickship Direct, Inc.*, No. 01-661MJD/SRN, 2001 WL 1640093 (D. Minn. Dec. 12, 2001) (finding a definite offer because there were "specific criteria to measure accomplishment of the goals"). However, the general principles of contract formation are not satisfied and no offer has been made when compliance

with a policy contained in the employee handbook or with the terms of a bonus plan is entirely discretionary. *Travelers Cos.*, 764 F.Supp.2d at 1087–88 (finding no definite offer because the plan "clearly state[d] that the awarding of bonuses [was] within the discretion of [the company]"); *Grenier v. Air Express Int'l Corp.*, 132 F.Supp.2d 1198, 1199, 1201 (D. Minn. 2001) (finding no definite offer because the plan gave the company "complete discretion to determine what business qualified for the incentive bonus").

TCP argues that its retention of absolute discretion to modify the Bonus Plan precludes it from being a sufficiently definite offer. The cases on which TCP relies do not support its position. In *Chambers v. Travelers Cos.*, the court considered a benefits plan that stated, "[bonuses] are discretionary awards used to reward superior performance," and as such, they "are given at the discretion of management, and no specific performance rating guarantees [a] payout." 764 F. Supp. 2d at 1080. The absolute discretion retained by the company in that case pertained specifically to whether bonuses would ever be paid at all. As such, it was "not possible for the Court to fix the legal liabilities of the parties," making any promise contained in this plan wholly illusory. *Id.* at 1087. The other case on which TCP relies, *Grenier v. Air Express Int'l Corp.*, addressed a bonus plan that purported to offer awards based on the development of new business. That promise, however, was also illusory because the company reserved complete discretion for itself to determine what constituted "new business." 132 F.Supp.2d at 1201. In both cases, it was the "reservation of discretion as found [under the given facts] [that] preclude[d] the manifestation of a binding offer"; not merely that any discretion to affect the terms of the offer was reserved by the companies. *Id.*

As noted by the Minnesota Supreme Court, "[a]n offerer of a unilateral contract always retains the power to modify or revoke the offer so long as the offeree has not begun performance,

but retention of that power does not preclude the offer from" being sufficiently definite. *Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d at 708 (holding that "a mere reservation of the right to amend or modify [a] handbook" does not prevent its sufficiently definite provisions from forming the basis of a legally enforceable contract). The facts of *Bley v. Clickship Direct* illustrate how this principle is applied in the context of a non-illusory revocable bonus plan. 2001 WL 1640093. The plan in *Bley* "provided for specific criteria to measure the accomplishment of each employee toward . . . stated goals." *Id.* at *1. However, the company's board retained discretion to modify or cancel the plan "based on factors which the Board consider[ed] appropriate for the year." *Id.* Thus, the discretion to modify or cancel the plan was absolute. The court found that the plan contained a sufficiently definite offer to form a contract despite the board's absolute discretion because "the amount of bonus each employee [was] entitled to . . . [could] be readily discerned." *Id.* at *2.

The C&I Bonus Plan, like the plan in *Bley*, contained a sufficiently definite offer: "The payout schedule below details the percentage of base salary that will be paid for meeting performance objectives." (R. 45-10, 2011 Bonus Plan, PageID # 1147.) Analogous to the plan in *Bley*, "specific criteria [were used] to measure the accomplishment of each employee." 2001 WL 1640093, at *1. Thus, we are left with little doubt as to "the amount of bonus each employee [was] entitled to" if the offer were accepted. *Id.* at *2. According to the C&I Bonus Plan, Bahr's accomplishment of increasing sales by 113% and maintaining a profit margin of 42% warrants a bonus award of 200% of her base salary.

TCP's objective manifestations also support the conclusion that the C&I Bonus Plan constituted a sufficiently definite offer. The plan required the approval of TCP's CFO, Valerie Campbell; and in her own words, it was "a valid plan." TCP's intent to be bound was also

manifest in the precision of the matrix itself—it clearly equated objectively measurable achievements to specific dollar totals of bonus compensation. Like the offer in *Hartung*—"[y]ou boys stick with me for five years and I will give you a hundred dollars a year bonus"—the statement written above the Bonus Plan's matrix, "[t]he payout schedule below details the percentage of base salary that *will be paid* for meeting performance objectives," is sufficiently clear. (emphasis added). The form terms and conditions reserving discretion to TCP that were attached to the C&I Bonus Plan do not diminish the definitive nature of this promise. These clauses by their own language applied to limited circumstances.[2] *See Kvidera v. Rotation Eng'g and Mfg. Co.*, 705 N.W.2d 416, 420 (Minn. Ct. App. 2005) ("The language found in a contract is to be given its plain and ordinary meaning."). Thus, the presence of these clauses does not obfuscate the legal obligations of each party that would arise should the offer be accepted. *See id.*

The district court referred to a number of cases from other jurisdictions to support its conclusion that the absolute reservation of discretion to revoke a plan makes an offer too indefinite. These cases are easily distinguishable because the plans involved in each of these cases included only ill-defined or wholly illusory promises.[3] Moreover, the Minnesota Supreme

---

[2] TCP reserved discretion to: 1) "amend, change, or cancel the Bonus Plan"; 2) "reduce, modify or withhold awards based upon individual performance or management modification"; or 3) address "windfall or shortfall situations," in which case the participant would be notified in writing. (R. 45-10, 2011 Bonus Plan, PageID # 1146). That this discretion could be exercised prior to Bahr's acceptance, as will be discussed below, does not sufficiently mitigate against the clarity of the offer to prevent the formation of a contract under Minnesota law.

[3] *See, e.g.*, *Jensen v. IBM Corp.*, 454 F.3d 382, 385 (4th Cir. 2006) ("Even though you may be given progress reports regarding plan achievement during the year, no one becomes entitled to any payment in advance of his or her receipt of the payment."); *Geras v. IBM Corp.*, 638 F.3d 1311, 1314 (10th Cir. 2011) ("Any information regarding Plan achievement that may be made available to employees during the year is provided for information purposes only, and does not constitute a promise by IBM to make any specific distributions to any employee.");

Court in *Feges* unequivocally held that the absolute reservation of discretion to revoke an employment plan or policy does not in itself make the offers contained within indefinite. *Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d at 708 ("We did not mean to imply . . . that a mere reservation of the right to amend or modify the handbook precluded the handbook from being a contract."). The district court erred by granting summary judgment in favor of TCP on the basis that the C&I Bonus Plan was too indefinite to be an offer.

**B.    Bahr's Continued Employment and Efforts In Hitting Her Numbers Constitute Valid Consideration**

No offer will ripen into a contract without valuable consideration. *Travelers Cos.*, 764 F. Supp. 2d at 1087–88. TCP contends that Bahr was incapable of offering consideration because "[she] was already tracking in line to earning a maximum bonus of 200 percent." *Appellee Br.* at 24. We disagree. Consideration exists when the promisee performs "the designated act or forbearance" stated by the offer. *Hartung*, 66 N.W.2d at 789. "However, for performance to constitute an acceptance, it must differ from what the promisee is already contractually obligated to do." *Peters v. Mut. Benefit Life Ins. Co.*, 420 N.W.2d 908, 913 (Minn. Ct. App. 1988). TCP's contention is meritless because Bahr was not contractually obligated to continue working in her position for any specified duration of time. *See Peters*, 420 N.W.2d at 913 ("[C]onsideration supporting a unilateral contract can be supplied when an at-will employee stays on the job although free to leave."); *Hartung*, 66 N.W.2d at 790 ("The fact that plaintiff made the offer of a bonus after defendant had entered his employment does not indicate lack of consideration

---

*Schwarzkopf v. IBM, Inc.*, No. C 08-2715JF(HRL), 2010 WL 1929625, *2 (N.D. Cal. May 12, 2010) ("IBM reserves the right to review and, in its sole discretion, adjust incentive payments associated with transactions which (1) are disproportionate when compared with the territory opportunity or quota size; or for which (2) the incentive payments are disproportionate when compared with the individual's performance contribution towards the transactions.").

Since[sic] the defendant was not already legally bound to continue serving his employer for the specified time."). Therefore, TCP should not have been granted summary judgment as to count two of Bahr's complaint on this basis.

### C. TCP Did Not Seasonably Exercise Its Discretion

The district court held, in the alternative, that TCP properly exercised its discretion to modify Bahr's award, thus precluding her claim for breach of contract. We do not share this judgment. The relevant clause read[4]:

> Management reserves the right to amend, change, or cancel the Bonus Plan at its discretion. It also reserves the right to reduce, modify or withhold awards based upon individual performance or management modification.

TCP failed to exercise any of these rights prior to Bahr's acceptance.[5] Acceptance of a unilateral contract occurs upon complete performance. *Hartung*, 66 N.W.2d at 787. The C&I Bonus Plan stated, "all bonus plans are on an annualized basis and based on a calendar year." (R. 45-10, 2011 Bonus Plan, PageID # 1146). Thus, the consideration was given and the contract was formed when Bahr ended the calendar year with 113% year-over-year sales growth and a 42% gross margin. From that point, no modifications could be made to affect her 2011 bonus because it had already vested. *See Hartung*, 66 N.W.2d at 789 ("The moment [that the] offer was thus converted into a contract, the bonus became due and payable."); *see also Kvidera*, 705 N.W.2d at 423 ("[R]espondent's right to the [bonus] vested . . . the day after the expiration of the [applicable bonus period]."). In light of the clear offer to contract—"[t]he payout schedule

---

[4] TCP concedes that it was not relying on the Windfall and Shortfall provision.

[5] The record strongly indicates that the decision to unilaterally reduce C&I awards was made on January 15, 2012. On that date, CFO Valerie Campbell sent the email that identified as a problem the C&I bonus estimates and noted the need to adjust the award accordingly, to "considerably less than the original bonus estimates." (R. 41-1, Ex. E, PageID # 370.)

below details the percentage of base salary that will be paid for meeting performance objectives"—we cannot tenably interpret the Bonus Plan to allow post-acceptance modification. *See* 11 Williston on Contracts § 32:11 (4th ed. 2014) ("[A]n interpretation which renders a contract lawful is preferred over one which renders it unlawful."); 1 Williston on Contracts § 4:21 (4th ed. 2014) ("[A] reservation in either party of a future unbridled right to determine the nature of performance . . . has often caused a provision to be too indefinite for enforcement.").

### 1. Pre-Acceptance

TCP suggests that Bahr was put on notice that her entitlement to any bonus was indefinite when CFO Valerie Campbell sent a company-wide email on December 21, 2011, stating that the "ability . . . to pay bonuses will not be determined until the books are completely closed for the year which would be sometime in January." (R. 45-11, Bonus Ltr., PageID # 1448). Contracts may be revoked by words or conduct that is inconsistent with the intent to honor a promise. *Feges*, 483 N.W.2d at 708. However, the intent to revoke must be clearly communicated to the offeree; the general dissemination of information that may or may not be perceived as inconsistent with the offer is insufficient. *See id.* (finding that the offers made in an employee handbook had not been revoked simply upon the issuance of a revised handbook that explicitly disclaimed any intent to contract).

Campbell's December 12, 2011, company-wide email was not a clear revocation or modification of the C&I Bonus Plan. Notably, the email distinguished employees on a "defined bonus plan" from the general population of employees by noting that the holiday bonus would be "considered an advance on [their] official bonus." (R. 45-11, Bonus Ltr., PageID # 1448.) Under these circumstances, Bahr reasonably surmised that the December 21 email did not impact her rights under her "defined bonus plan." *Cf. Feges*, 483 N.W.2d at 708 (distinguishing

between employees who received a handbook that was an offer to contract followed by one that was not, and those employees who only received the latter). For this reason, the December 21 email was not sufficiently clear to revoke, amend, change, cancel, or modify, the C&I Bonus Plan or Bahr's individual award thereunder.

### 2. Post-Acceptance

TCP contends that post-acceptance modification is supported by *Bley v. Clickship*, discussed above, and by *Brozo v. Oracle Corp.*, 324 F.3d 661 (8th Cir. 2003). *Bley* is inapposite for such a proposition[6] and the facts of *Brozo* are distinguishable. In *Brozo*, the court considered a bonus and commissions plan that reserved a right for the company to make changes to individual awards "at any time, during *or after* the close of the fiscal year." 324 F.3d at 663 (emphasis added). The plan also noted that bonuses would "not vest until the Company ma[de] any and all final changes." *Id.* The *Brozo* court relied on this "unambiguous" language in holding that the company was entitled to reduce a commission even after it had been fully earned. *Id.* at 667.

The C&I Bonus Plan contained no language suggesting that Bahr's bonus could be changed after the fiscal year closed or that it would not vest until the point at which she received the payout. Moreover, the C&I Bonus Plan was distinct from Bahr's employment contract. On its own, the plan in *Brozo* was not a sufficiently definite offer to contract because its promises were no more than a mirage in light of the company's ability to retroactively affect what would

---

[6] The plaintiffs in *Bley* were fired before any bonus was paid out. *Bley*, 2001 WL 1640093, at *2. Naturally, the bonus plan required that the employees still be with the company at the close of the bonus period. *Id*. at *1. Thus, the appellate court remanded the case for the trial court to determine whether the company fired its employees in good faith or as an attempt to free itself of its bonus obligations which it would otherwise be contractually obligated to pay. *Id.* at *2.

otherwise be vested rights. The dissent noted as much, but could not overcome the parties' agreement that the bonus plan was simply part of a larger negotiated contract. *Id.* at 671 (J. Lay, dissenting) ("[T]hat his employer may act within its sole discretion to do whatever it wants to do, renders the contract illusory."). Therefore, we find no support in *Brozo*'s holding that Minnesota law allows for the post-acceptance modification of Bahr's vested rights. Absent a valid defense by TCP, Bahr was entitled to summary judgment on her breach of unilateral contract claim.

### 3.      Bahr's Continued Employment

TCP strives to foreclose summary judgment in Bahr's favor by positing that her retention of the reduced sum in concert with her continued employment modified any contract rights she once had.[7] The unreported case on which TCP relies involved a modification that resulted from a company's repeated failure to pay an employee's commissions due under an employment contract and the employee's implicit acquiescence to the repeated practice of nonpayment. *Friedenfeld v. Withrop Resources Corp.*, C5-0201606/C4-02-1659, 2003 WL 1908112, *5 (Minn. Ct. App. Apr. 22, 2003). Bahr's bonus was derived from a distinct plan dealing only with her performance in 2011 and not an ongoing employment contract. There was one bonus, which she did not receive in full, and it vested prior to her resignation. *See Kvidera*, 705 N.W.2d at 423 ("[R]espondent's right to the [bonus] vested . . . the day after the expiration of the [applicable bonus period]."). Thus, she could not have acquiesced to a new arrangement where it was generally understood that bonuses were a discretionary award.

---

[7] TCP also asserts that Bahr's continued employment effected an accord and satisfaction, but has waived this defense as it was not raised below. *Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 824 (6th Cir. 1990).

We recapitulate: the C&I Bonus Plan was a sufficiently definite offer; Bahr accepted the offer by giving the valuable consideration of her continued employment; TCP did not timely exercise its discretion to amend, change, cancel or modify the Bonus Plan (or Bahr's award thereunder); nor did Bahr's acceptance of the inadequate sum modify her previously vested rights. Thus, Bahr was entitled to an award equal to 200% of her base salary, and she is now due at minimum the $51,716 unpaid balance of her bonus. That TCP overextended its finances is irrelevant. A party may not forego one obligation merely because they believe the satisfaction of another is more important. There is no language in the C&I Bonus Plan that makes the payouts thereunder subordinate to TCP's bank financing terms. TCP was aware when it offered the Bonus Plan to induce Bahr's retention and continued excellence that her bonus liability in particular was tracking toward a substantial figure. TCP reserved many outs so that it would not be bound to its offer on the basis of substantial performance. That the company failed to exercise its reserved rights is the basis for its liability.

We find it unnecessary to fully discuss Bahr's breach of bilateral contract claim, but note our agreement with the district court's grant of summary judgment on that issue. The pre-employment email exchange does not support Bahr's contention that she joined TCP based on the explicit promise that TCP would institute a specific bonus plan. Moreover, TCP instituted a bonus plan that was more advantageous than what was previewed in the email exchange. Bahr's other theories of recovery are also fruitless, but need not be addressed. We do not pass judgment on Bahr's right to amend her complaint.

## II.     The Minnesota Prompt Pay Statutes

We now turn to the prompt pay statutes.  Bahr claims entitlement to double damages, relying on three distinct provisions of the Minnesota statutes: §§ 181.03, 181.13, and 181.14.[8] These provisions do not create substantive rights;  instead they offer a recovery mechanism for past due wages and impose civil penalties on employers that fail to seasonably remit those wages.[9]  *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 837.  The applicability of each provision will be addressed in turn.

### A.     Section 181.03

Liability under this section attaches only if the employer acts with a fraudulent intent.  § 181.03.  Bahr contends that TCP executives were aware that the fixed charge coverage ratio would be a problem prior to the end of the calendar year, yet continued encouraging Bahr to hit her numbers so that she could earn the maximum bonus.  This contention is not supported by the record and is insufficient to plead fraud.  *See* Fed. R. Civ. P. 9(b).  TCP is entitled to summary judgment with respect to this provision.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B.     Section 181.13

Section 181.13 applies only where an employee has been discharged by the company. Bahr claims that summary judgment was inappropriate because there is sufficient evidence in the record to suggest that she was constructively discharged.  Though Bahr expressed her

---

[8] Only §181.03 provides for double damages.  An employer who is found liable under any of these provisions shall also be made to pay for reasonable costs and attorney fees.  § 181.171.

[9] An earned bonus constitutes a wage under the statutes.  *See Kvidera*, 705 N.W.2d at 423–24.

"disappointment" and desire to work for a "more honest" company upon her resignation, the record indicates that she was offered other opportunities for advancement and continued to receive top marks in her performance reviews after the dispute began. Construing the facts in the light most favorable to Bahr, working conditions were not "so intolerable that [she was] essentially forced to leave the employment." *Willis v. Henderson*, 262 F.3d 801, 810 (8th Cir. 2001). TCP is therefore also entitled to summary judgment foreclosing any recovery under this provision.

## C.     Section 181.14

TCP does not dispute the applicability of § 181.14 other than contesting Bahr's entitlement to the bonus itself. Section 181.14 requires the full payment of any earned and unremitted wages to be made at "the first regularly scheduled payday following the employee's final day of employment." Bahr's bonus was earned at the close of the 2011 calendar year and was to be paid no later than 45 days later, pursuant to the C&I Bonus Plan. This payment was outstanding when Bahr resigned on October 8, 2012. The next regularly scheduled payday was October 15, 2012. Payment of Bahr's "earned and unpaid" bonus was statutorily due on that date. *See Kvidera*, 705 N.W.2d at 423–24 (holding that an "earned bonus constitute[s] a 'wage' for the purpose of Minn. Stat. § 181.13").[10]

When an employer fails to remit earned but unpaid wages the employee can demand those wages in writing, at which point they must be paid within twenty-four hours. § 181.14(2). The failure to make a timely payment results in a civil penalty "equal to the amount of the employee's average daily earnings at the employee's regular rate of pay . . . not exceeding

---

[10] Section 181.13 uses the same "wages or commissions" language as used in section 181.14. "These two statutory provisions must be read together." *Chatfield v. Henderson*, 90 N.W.2d 227, 232 (Minn. 1958).

15 days in all." § 181.14(2). The penalty is mandatory and there is no minimum dollar threshold for its enforcement. *Kilton v. Richard G. Nadler & Associates*, 447 N.W.2d 468, 471 (Minn. Ct. App. 1989). Thus, TCP is liable for civil penalties pursuant to § 181.14 of the Minnesota Statutes.

## CONCLUSION

We **REVERSE** and **REMAND** to the district court for entry of summary judgment in favor of Bahr consistent with this opinion.